Michael VOGT, Paul Beaumont, and Fred Breu on their own behalf and as representative plaintiffs on behalf of all similarly situated employees of Outboard Marine Corporation, Plaintiffs,

v.

GREENMARINE HOLDING, LLC, Quasar Strategic Partners, LDC, Greenlake Holdings, LLC, Greenlake Holdings II, LLC, Quantum Industrial Partners, LDC, Quantum Industrial Holdings, Ltd., QIH Management Investors, L.P., and QIH Management, Inc., Defendants.

No. 02 Civ. 2059(GEL).

United States District Court, S.D. New York.

Jan. 29, 2004.

Jeffrey H. Daichman, Nahum A. Kianovsky, Kane Kessler, P.C., New York City, James C. Anders, P.A. & Associates, Columbia, SC, of counsel, for Plaintiffs.

Mark A. Jacoby, Lawrence J. Baer, Weil, Gotshal & Manges, LLP, New York City, for Greenlake Holdings LLC and Greenlake Holdings II, LLC.

Mark H. Alcott, Mark D. Meredith, John W.R. Murray, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York City, for Greenmarine Holdings LLC, Quasar Strategic Partners, LDC, Quantum Industrial Partners, LDC, Quantum Industrial Holdings Ltd., QIH Management Investors, L.P., and QIH Management, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

This is an action brought under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* ("WARN" or "the Act"), which requires employers to give sixty days notice to employees prior to a mass layoff or plant closing. Plaintiffs bring suit on behalf of themselves and similarly situated former employees of Outboard Marine Corporation ("OMC"), a South Carolina company formerly engaged in the design, manufacture and sale of outboard motors, and currently in bankruptcy under Chapter 11. Because OMC is in bankruptcy proceedings, it is neither possible, because of the automatic stay, nor practical, to sue the company itself. Instead, plaintiffs bring this action for failure to provide notice of the plant closings against a group of investment companies that together owned or controlled the majority of OMC's stock. Essentially, plaintiffs seek sixty days' pay and benefits for each person in the class, plus costs and attorneys' fees.

Defendants move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R.Civ.P., for failure to state a claim upon which relief can be granted.[1] Because

---

1. Two separate motions to dismiss have been filed, one by defendants Greenmarine Holdings, LLC; Quasar Strategic Partners, LDC; Quantum Industrial Partners, LDC; Quantum Industrial Holdings, Ltd.; QIH Management Investors, L.P.; and QIH Management, Inc. ("Greenmarine Defendants"), and one by defendants Greenlake Holdings LLC and Greenlake Holdings II LLC ("Greenlake Defen-

plaintiffs have made specific factual allegations regarding the relationship of certain of the defendant companies to OMC and their role in the decision to effect a mass layoff of OMC employees, which, if true, would entitle plaintiffs to relief under the WARN Act's test for intercorporate liability, the motions to dismiss shall be denied as to defendants Greenmarine Holdings, LLC ("Greenmarine"); Quantum Industrial Partners, LDC ("QIP");[2] and Quantum Industrial Holdings, Ltd. ("QIH"), and granted as to defendants Quasar Strategic Partners, LDC; Greenlake Holdings, LLC; Greenlake Holdings II, LLC ("Greenlake II"); QIH Management Investors, L.P.; and QIH Management, Inc.

## BACKGROUND

On December 21, 2000, OMC filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On or about that date, OMC shut down its thirteen facilities in states including Florida, Georgia, and North Carolina, and fired the majority of its employees, approximately 6,500 people, without prior notification. Lawsuits alleging violation of the WARN Act were filed against the defendants by former employees in at least two other federal courts before the instant complaint was filed here on March 13, 2002.[3]

The complaint seeks damages not from OMC itself, but from eight investment companies that together owned or controlled the majority of OMC's stock. Plaintiffs allege that defendants Greenmarine, Greenlake Holdings II, QIP and the companies that owned or controlled them, together with OMC, acted as a "single employer" for purposes of the WARN Act, essentially for three reasons. First, plaintiffs allege that defendants owned or controlled a majority of OMC's stock and "control[led] all corporate transactions of OMC." (Compl. ¶¶ 5, 18.) Second, plaintiffs allege that the defendants and OMC were part of a single integrated structure because the same individuals who were on the boards of various defendant companies were also directors of OMC at the time OMC petitioned for bankruptcy. (*Id.* ¶ 30) Additionally, plaintiffs argue that the defendant companies are directly liable under the WARN Act as parents of OMC, because, they allege, certain defendant companies had the authority to and did make the decision that OMC petition for bankruptcy and effect the mass layoff in violation of the WARN Act.

Specifically, plaintiffs allege that from 1997 through December 22, 2000, "the financial, management and operational decisions that resulted in the mass plant closings and Chapter 11 Bankruptcy filing of OMC were made by the Management Committee of Greenmarine.... During the year 2000, the Management Committee of Greenmarine consisted of Alfred Kingsley, Gary Duberstein, Frank Sica, Ron Hiram and Richard Katz[, who] also

dants"). The Greenlake Defendants adopt the arguments advanced by the Greenmarine Defendants, and this opinion disposes of both motions.

**2.** The caption of the complaint names Quantum Industrial Partners, LDC, as a defendant. The body of the complaint refers both to that entity (Compl.¶ 34), and to a "Quantum Industrial Partners, Ltd." (*id.* ¶ 33.) The Court assumes that this is an oversight, that the names refer to the same entity, and will use the abbreviation QIP for both.

**3.** Suits were filed in the Northern District of Georgia, *see Vogt v. Greenmarine Holdings, LLC,* Dkt. No. Civ. A.1:01–CV0311 (JOF), 2002 WL 534542 (N.D.Ga., Feb. 20, 2002), and the Northern District of Illinois, *see Caccamo v. Greenmarine Holdings, LLC,* Dkt. No. 01 C 0899 (Darrah, J.), 2002 WL 1466818 (N.D.Ill. July 8, 2002). Both complaints were dismissed for lack of personal jurisdiction, in decisions pointing out that the test for personal jurisdiction differs from the standard for WARN Act liability.

constituted the board of directors of OMC." (*Id.* ¶ 21.) In addition, the complaint alleges that "in November 2000, ... [QIP and QIH] directed OMC to file bankruptcy and sell all its assets" (*id.* ¶ 28), and that "[QIP] participated in and caused the preparation of the corporate resolution and the directions contained therein to be issued which resolution directed the company to file bankruptcy" (*id.* ¶ 33).

Furthermore, plaintiffs allege that QIP and QIH solicited Roger Fix to join OMC as its Chief Operating Officer (*id.* ¶ 26), contracted with Fix to coordinate the bankruptcy filing and negotiate sale of OMC's assets (*id.* ¶ 29), and that QIP signed Fix's employment contract and guaranteed payment of his compensation (*id.* ¶ 26). Finally, the complaint alleges vaguely that "representatives of certain defendants or their affiliated companies" and "lawyers from the law firm of Paul, Weiss, Rifkin[d], Wharton & Garrison who ... were representing Defendants [Greenmarine], Quasar Strategic Partners, LDC, [QIP, QIH], QIH Management Investors, L.P. and QIH Management Inc." were present at telephone meetings when "critical decisions were made directly affecting OMC employees, including ... the decision for OMC to file Chapter 11 bankruptcy." (*Id.* ¶ 34.)

Defendants contend that the defendant companies are investors in OMC, not joint-employers with OMC, and acted the way parent companies commonly act in regard to a subsidiary. They argue that no extraordinary circumstances exist which would make them liable for the acts of OMC in petitioning for bankruptcy and shutting down its facilities.

## DISCUSSION

### I. Standard for Dismissal under Federal Rule of Civil Procedure 12(b)(6)

In the context of a motion to dismiss, the Court accepts "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998) (internal citations omitted). The "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted). Furthermore, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002), quoting *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

Plaintiffs argue that the allegations in the complaint concerning OMC's relationships to defendant companies are sufficient to permit them to conduct full discovery in order to attempt to prove those allegations. (Pl. Mem. at 8.) Defendants respond that plaintiffs have not alleged specific facts which would enable them to pierce the corporate veil, and that therefore plaintiffs are not entitled to any discovery into the corporate relationships alleged nor into the decision to shut down OMC's facilities.

Defendants' argument is unpersuasive because the standard for veil piercing does not govern claims arising under the WARN Act. Rather, the question is more simply whether plaintiffs have alleged facts about defendants' corporate structure and the decision to shut down the OMC plants and effect mass layoffs which, if true, would entitle them to relief against these defendants under WARN. As to

some of the defendants, that standard is met.

## II. *The Worker Adjustment and Retraining Notification Act*

WARN requires employers to give sixty days' notice to their employees before mass layoffs or plant closings. 29 U.S.C. § 2101. It was enacted in the wake of numerous plant closings in the 1970s and 1980s, in order to soften the blow of job loss to workers and their families by providing some advance notice to allow for transition time to different employment. *See Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175 (3d Cir.1999). A principal enforcement mechanism of the Act permits employees to seek damages from their employer in federal court in an amount equivalent to sixty days' pay and fringe benefits when the employer fails to give proper notice of a mass layoff. 29 U.S.C. § 2104(a).

 There is no question that the complaint alleges a blatant violation of the WARN Act by OMC, committed virtually on Christmas Eve, as if to drive home the company's disdain for its workers as well as for the law. The question presented by this motion to dismiss is whether plaintiffs have alleged specific facts which, if true, are sufficient to show that the companies that owned or controlled a majority interest in OMC are employers of the laid-off employees within the meaning of the Act.

The Act defines an employer as "any business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a). It further provides that: "[a]ny employer who orders a [site] closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for (A) back pay ... and (B) benefits." 29 U.S.C. § 2104(a)(1).

As the Third Circuit has noted, and as the parties' papers convey, courts have applied a variety of tests to determine the status of related corporations in the WARN context. *See Pearson v. Component Technology Corp.*, 247 F.3d 471, 483–84 (3d Cir.2001) (discussing WARN liability for secured lenders of a defunct employer on a motion for summary judgment). The confusion arises in part from the different tests used to determine whether multiple companies form a single entity for purposes of various state or federal laws. *Id.* Among the tests applied are an alter ego/veil piercing test, the federal labor law "integrated enterprise" test first developed by the National Labor Relations Board, and the test set forth in Department of Labor ("DOL") regulations concerning application of WARN itself. While the parties mention all three tests, this Court focuses on the DOL test because the WARN regulations specifically define it as the test to be used in such a circumstance, and because the five-factor DOL test encompasses the four-factor federal labor law integrated enterprise test.

The defendants argue that the test for veil piercing, which has been characterized as "notoriously difficult for plaintiffs to meet," *id.* at 485, should apply in the WARN context. While the Second Circuit has not addressed this issue, the Third Circuit has had occasion to consider it and has decided that the appropriate test for intercorporate WARN liability is the five-factor DOL test, which emphasizes de facto control of the decision to effect a mass layoff of employees, and not on veil piercing and/or the integrated employer test, or a combination of all three. *Id.* at 471. *See also Administaff Cos. v. UNITE*, 337 F.3d 454, 458 (5th Cir.2003) (following *Pearson* and applying DOL test for intercorporate WARN Act liability).

■ The Third Circuit's analysis is persuasive. The court correctly observed that "[t]he current trend toward applying more than one test for affiliated corporate liability is manifestly unworkable" because the different tests could lead to different outcomes and thus create greater confusion rather than clarity. *Id.* at 489. Furthermore, the court noted that applying only the DOL test "has the virtue of simplicity ... [and] allows for the creation of a uniform standard of liability for the enforcement of a federal statute." *Id.* at 489–90. Unlike the other tests, which were created to deal with different sorts of problems, the DOL test was designed by the administrative agency responsible for implementing WARN, having in mind the particular situations addressed by the Act. State law tests for veil piercing, applicable as a general matter of state corporate law, are particularly inappropriate. Such tests, which may vary from state to state, may apply as a general measure of corporate identity and liability when federal law provides no specific rule of liability. They are not controlling where federal law provides a specifically-applicable liability rule. As both the Third and Fifth Circuits have agreed, "the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind." *Pearson,* 247 F.3d

at 490. *See also Administaff,* 337 F.3d at 458 (same).

As the Department has emphasized, these factors are not radically different from those employed under other legal tests, and the standard it adopts attempts to distill, rather than to replace or reform, those tests.[4] As this suggests, the factors set forth by the Department are similar to the "single-employer" or "integrated enterprise" test utilized in other employment and labor law contexts.[5] *See generally Pearson,* 247 F.3d at 477.

The DOL regulation enumerates five relevant factors for courts to use when considering whether to impose WARN Act liability on a parent corporation. The regulation provides that:

> Under existing legal rules ..., subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent of contracting company depending upon their degree of independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a

4. According to the Department:
 The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN purposes; the definition is intended only to summarize existing law that has developed under State corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA).
 54 Fed.Reg. 16,045 (Apr. 20, 1989). While the regulation does not set forth a novel test, it must be noted that the attempt to "summarize" factors applied under the laws of various states and in connection with diverse

federal statutes inevitably will correspond to none of those differing legal rules, and thus creates a new, synthesized standard. As the Third Circuit has recognized, the best way to apply this regulation is to apply it, and not to revert to a confusing welter of tests from which it was derived. *See Pearson,* 247 F.3d at 490.

5. The Second Circuit has described the single-enterprise test as addressing (i) common ownership; (ii) common management; (iii) centralized control of labor relations; and (iv) interrelation of operations. *Cook v. Arrowsmith Shelburne,* 69 F.3d 1235, 1240 (2d Cir. 1995).

common source, and (v) the dependency of operations.

20 CFR § 639.3(a)(2).

In the context of the fact-specific inquiry into whether a company can be held responsible under WARN for the act of a related company, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach. As the Third Circuit has noted, the DOL test is a balancing test "intended to discover whether ... nominally separate entities actually functioned as a single business, particularly with regard to labor policy." *Pearson,* 247 F.3d at 498. The labor policy at issue in a WARN case is the decision to terminate the employment of a significant part of a company's work force.

### III. *Department of Labor Employer Liability Test*

#### A. *Common Ownership*

The corporate family tree described by plaintiffs, once the branches are untangled, reveals that only three defendants are alleged actually to own shares in OMC directly. Plaintiffs assert that defendant investment companies Greenmarine, Greenlake II, and QIP own 62.5%, 7.9%, and 25.3% respectively, of the shares in OMC. None of the six other defendants are alleged to directly own any stock in OMC. Rather, they are investment vehicles that own interests in Greenmarine, Greenlake II, and QIP. Reading the facts in the light most favorable to the plaintiffs, because Greenmarine, Greenlake, and QIP together own a majority of shares in OMC, common ownership is established as to those companies. Because the other defendant companies are at best grandparents of OMC, plaintiffs have not alleged "common ownership" as to those companies. The finding of common ownership of OMC as to Greenmarine, Greenlake, and QIP is of limited significance to the inquiry at hand, since it is well established that stock ownership alone is not grounds for holding a parent liable for its subsidiary's actions. *See United States v. Bestfoods,* 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). However, the factor counts in favor of liability for those entities.

#### B. *Common Directors and/or Officers*

This factor is met as to Greenmarine and Greenlake II because plaintiffs have alleged that all of OMC's five Board members were on the Greeenmarine management committee that appointed the OMC Board, and two of them, Mssrs. Kingsley and Duberstein, were also on the board of Greenlake II. None of the other defendant companies are alleged to have shared directors or officers with OMC, so those defendants do not meet this element of the DOL test. The finding that OMC shared directors with certain of the defendants is also of limited importance. As the Supreme Court has noted:

> [I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary.... Since courts generally presume that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary, it cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities at the [subsidiary].

*Bestfoods,* 524 U.S. at 69–70, 118 S.Ct. 1876. While this factor is thus of limited importance, it counts in favor of liability for Greenmarine and Greenlake II.

#### C. *Unity of Personnel Policies Emanating from a Common Source*

This aspect of the DOL test is analogous to the aspect in the federal labor law test concerning "centralized control of labor operations," which the Second Circuit has

considered to include factors such as centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining. *See Clinton's Ditch Coop. Co. v. NLRB,* 778 F.2d 132, 138–39 (2d Cir.1985). Here, there are no allegations that the defendant entities controlled or even participated in the day-to-day personnel policies or daily labor operations of OMC. The defendant entities are investment companies, not manufacturers of marine motors or indeed, anything at all. There is no indication that defendant companies played any role in any day-to-day employment policies at OMC's plant.

The complaint does assert, however, that the defendant companies, particularly QIP and QIH, made the decision to effect the mass layoff of OMC employees in violation of the WARN Act notice provisions at the time the bankruptcy petition was filed. In the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy. Since the purpose of WARN, as its acronym implies, is to protect workers by encouraging employers to provide advance warning of plant closings, in a sense the *only* personnel policy that the statute is concerned with is the mass layoff decision. Here, there is no allegation that defendant companies controlled OMC's quotidian policies such as individual hirings, firings, benefit provision or record maintenance, but plaintiffs do assert that defendants controlled the ultimate decision to close the plant with no advance notice and fire almost everyone. That allegation carries considerable weight in a WARN liability analysis. In contrast, where a defendant does control daily personnel policies but is powerless when it comes to the decision to effect a mass layoff, the unity of daily personnel policies would carry comparatively little weight in a WARN liability analysis. The allegation that defendants directed the decision to shut the OMC

facilities will be more extensively considered in the de facto control prong of the DOL test. However, the fact that the personnel policy relevant to WARN liability is alleged to have emanated directly from QIP and QIH count strongly in favor of WARN liability for those entities.

### D. *Dependancy of Operations*

The *Pearson* court cited the following factors as relevant to this aspect of the DOL test: sharing of administrative or purchasing services, interchanges of employees or equipment, or commingled finances. 247 F.3d at 500. There are no allegations in the complaint that would demonstrate that the defendant companies controlled the day-today operations of OMC. While OMC's Board and CEO may have been ultimately responsible to Greenmarine and the Greenlake entities, "the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." *Pearson,* 247 F.3d at 501, *see also Cook,* 69 F.3d at 1241. This factor counts against liability for defendants.

### E. *De Facto Control*

The de facto control standard is not a factor in the federal labor law single employer test, but rather is an addition to that test provided for in the WARN Act regulations. The Third Circuit has explained that this factor "is not intended to support liability based on a parent's exercise of control pursuant to the ordinary incidents of stock ownership . . . *The factor is appropriately utilized, however, if the parent or lender was the decisionmaker responsible for the employment practice giving rise to the litigation.*" *Pearson,* 247 F.3d at 503–04 (emphasis added).

That is exactly the case here, where plaintiffs allege that the parent companies made the decision to effect a mass layoff of OMC's employees with no regard for the statutory warning time.

The Third Circuit pointed to the significance of the de facto control factor in establishing WARN Act liability, noting that "if the parent corporation has 'disregard[ed] the separate legal personality of its subsidiary' in directing the subsidiary to act, *Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir.1989)[,] such evidence alone might be strong enough to warrant liability." *Pearson*, 247 F.3d at 496. Of course, on a motion to dismiss, the Court does not weigh the strength of the evidence, and simply considers whether the complaint alleges sufficient facts which, if true, would permit a reasonable factfinder to find defendants liable.

In support of its allegations of "de facto control" by the defendant companies, plaintiffs offer the following assertions concerning the decision that OMC should petition for bankruptcy and close down its facilities: "The Defendants controlled the capitalization of OMC, engaged in major reorganizational activities at OMC in the several years prior to the bankruptcy, made the decisions regarding lay-offs and plant closings, [and] made the decision to file for Chapter 11 bankruptcy." (Compl.¶ 35). In contrast to these broad and conclusory assertions, which fail to name any specific actions taken by specific defendants, the complaint also alleges more particularly that QIP and QIH hired the OMC Chief Executive Officer, and that QIP was a signatory to his employment contract. Significantly, plaintiffs claim that QIP and QIH caused the preparation of and participated in the resolution that OMC file for bankruptcy, and contracted with the Chief Executive Officer of OMC to coordinate the bankruptcy filing. Finally, plaintiffs allege that Greenmarine's Management Committee made decisions resulting the in the plant closings, and that it was identical to OMC's board of directors. These assertions, taken together, are sufficient to allege that QIP, QIH and Greenmarine " 'disregard[ed] the separate legal personality of [the] subsidiary' in directing the subsidiary to act." *Pearson*, 247 F.3d at 496, quoting *Esmark*, 887 F.2d at 757. Since, as the Third Circuit notes, in some circumstances evidence of such disregard may itself be sufficient to warrant WARN Act liability, *Pearson*, 247 F.3d at 504, the allegation that QIH and QIP directed the employer to enter bankruptcy and shut its facilities, is sufficient to warrant discovery into plaintiffs' claims. The claims against Greenmarine are additionally supported by the overlapping directorships and majority stock ownership.[6]

### F. *Summary*

The Court's task on these motions to dismiss is to determine whether plaintiffs have alleged facts which, if true, would permit a jury to find any of the defendants liable for violation of the WARN Act notice

---

**6.** The allegation that attorneys from the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, representing a number of defendants in some unspecified capacity, were present at telephone conferences where important decisions regarding OMC were taken, including the decision that OMC declare bankruptcy and shut its facilities, fails to allege that any specific defendants actually ordered the plant closings. Even taking all facts in the light most favorable to plaintiffs, mere presence at a conference call does not allege de facto control over a decision taken at that conference call. While the allegation may provide additional support for a claim of de facto control by those present at the call (although the Court expresses no opinion as to the weight of any such evidence, which is an issue of fact for trial), it cannot be the sole hook for a claim of WARN Act liability as to defendants who are not otherwise implicated by any other factor of the DOL test.

provisions. In the absence of a Second Circuit ruling concerning which of the available multi-factor tests to apply to determine intercorporate WARN Act liability, the Court has followed the Third Circuit's decision in *Pearson* and relied on the balancing test set forth in the DOL regulations concerning the WARN Act. Allegations regarding each of the eight defendants must be considered separately, in spite of the fact that the complaint often lumps all eight defendants together in conclusory allegations that all defendants controlled all of the decisions that led to OMC's bankruptcy and plant closings. The Court must take the facts in the light most favorable to plaintiffs, cognizant of the fact that no discovery has taken place, without permitting conclusory allegations of "control" lacking specific factual basis to carry an otherwise unsupported claim past a motion to dismiss.

As specified above, the complaint alleges that QIP and QIH hired and controlled the OMC Chief Executive Officer, made the decision that OMC enter bankruptcy, and were present at the telephone meeting concerning the bankruptcy and plant closings. This is sufficient to state claim against those entities. Allegations against the other defendants are more diffuse, and with the exception of Greenmarine, the plaintiffs have not sufficiently alleged claims against them. In the case of Greenmarine, plaintiffs have alleged that it owns a controlling share in OMC, that the Management Committee of Greenmarine made decisions resulting in OMC's plant closings, and that the Management Committee of Greenmarine was identical to the OMC board of directors. This is sufficient to state a claim against Greenmarine.

Here, the complaint does allege the kind de facto control of OMC that the DOL test identifies as a significant factor for WARN Act liability in respect to QIH, QIP and Greenmarine. While the other factors cited in the DOL test taken together do not conclusively weigh in plaintiffs' favor, the de facto control element tips the balance towards plaintiffs for purposes of these motions to dismiss. The plaintiffs have alleged the kind of wrongdoing that the WARN Act was intended to punish, that is, the decision to effect a mass layoff with less than sixty days notice to the affected workers. The standard on a motion to dismiss is a generous one, and plaintiffs are not required to plead their WARN Act claim so as to withstand summary judgment before significant discovery has even taken place. Because the complaint alleges that QIP, QIH and Greenmarine made the decision to shut down OMC, which made the decision "less like a subsidiary's independent choice to terminate its business ... than like the decision of a WARN Act employer to close a single site of its operations," *Pearson*, 247 F.3d at 504, the plaintiffs will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) as against those defendants.[7]

---

**7.** Defendants cite *Local 217, Hotel and Restaurant Employees Union v. MHM, Inc.*, 976 F.2d 805 (2d Cir.1992) in support of their argument that the company that hires and fires is the sole company with WARN Act liability. However, the facts of that case are inapposite here. In that case, a hotel company had contracted with a management company to employ the hotel's staff. The Second Circuit found the management company that employed the hotel staff pursuant to a collective bargaining agreement liable under the WARN Act for firing the staff in the wake of the hotel's closing, even though the hotel company was ultimately responsible for the decision to shut down the hotel. While that case was not decided on a motion to dismiss, the facts alleged in the complaint are discernable in the decision and appear to differ significantly from the facts here. Notably, in *Local 217* the management company and the hotel had a contractual, not a parent-subsidiary relationship, and there was apparently no allegation that the hotel had the authority to or did order the management company to fire its employees.

This conclusion is consistent with the purpose of the WARN Act to provide workers with advance notice of plant closings by holding liable the employer that orders the closing. Essentially, plaintiffs allege that investment companies purchased OMC, and left the day-to-day functioning of OMC's outboard motor production to other managers. Plaintiffs' theory is that the decision with which WARN is concerned, the decision to effect plant closings, resided in the hands of the defendant investment companies. Plaintiffs have asserted sufficient facts to allege that certain of the investment companies possessed and exercised the authority to order OMC to petition for bankruptcy and shut down its facilities. Whether plaintiffs will be able to demonstrate the truth of those facts after discovery is an entirely different question, but plaintiffs are entitled to make the attempt.

### CONCLUSION

For the foregoing reasons, it is hereby ORDERED that:

1. The motions to dismiss are granted as to defendants Quasar Strategic Partners, LDC; Greenlake Holdings, LLC; Greenlake Holdings II, LLC; QIH Management Investors, L.P. and QIH Management, Inc.

2. The motions to dismiss are denied as to defendants Greenmarine Holding, LLC, Quantum Industrial Partners, LDC and Quantum Industrial Holdings, Ltd.

The parties are instructed to submit a proposed case management plan to the Court no later than February 9, 2004.