**In re SHELBY YARN COMPANY, EIN 56–2046560, Debtor.**

**Wayne Sigmon, Trustee in Bankruptcy for Shelby Yarn Company, Plaintiffs,**

v.

**Recovery Equity Investors, L.P.; Recovery Equity Partners, L.P.; Recovery Equity Investors II, L.P.; Recovery Equity Partners II, L.P.; Jeffrey A. Lipkin; Joseph J. Finn–Egan; Sidney H. Kosann; Norma J. Kosann; American Group Administrators, Inc.; Lloyd H. Goldstein; C.B. Planning Services Corp.; Jess Sofer; James T. Potter, Jr.; and Wayne Walton, Defendants.**

**Civ. No. 1:02CV218.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Feb. 19, 2004.

Wayne Sigmon, Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, PA, Gastonia, NC, for Debtor.

O. Max Gardner, III, Shelby, NC, Kiran H. Mehta, John H. Culver, III, Kennedy, Covington, Lobdell & Hickman, Charlotte, NC, Ruth L. Flemister, George Cornelius Nevitt, Fisher & Phillips, LLP, Atlanta, GA, for Plaintiffs.

John W. Taylor, Charlotte, NC, for Consolidated Plaintiff.

Mack Sperling, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, NC, for Interested Party.

George V. Hanna, III, Bradley E. Pearce, Daniel G. Clodfelter, Curtis J. Shipley, David H. LaRocca, Moore & Van Allen, Joseph E. Grier, III, Joseph W. Grier, III, Grier & Furr, P.A., Robert H. Pryor, Helms, Mulliss & Wicker, PLLC, James F. Wyatt, III, Mary Catherine Holcomb, Charlotte, NC, Christopher A. Parlo, Neil E. Herman, Jay Teitelbaum, Kevin Rover, Morgan Lewis & Bockius LLP, New York, NY, Jeffrey S. Dubin, Huntington, NY, for Defendants.

E. Fitzgerald Parnell, III, Parmele P. Calame, Poyner & Spruill, R. Keith Johnson, Charlotte, NC, Wayne Sigmon, Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, PA, Gastonia, NC, for Consolidated Defendants.

James T. Potter, Jr., Pro Se, Kings Mountain, NC, for Defendant.

Wayne Walton, Pro Se, Shelby, NC, for Defendant.

Curtis Sobel, Huntington, NY, for Third–Party Plaintiffs/Defendant.

Garth A. Gersten, Womble, Carlyle, Sandridge & Rice, Research Triangle Park, NC, Allan R. Gitter, Womble, Carlyle, Sandridge and Rice, Winston–Salem, NC, for Third–Party Defendants.

## MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the motions for summary judgment of the following Defendants: (1) Recovery Equity Investors, L.P.; Recovery Equity Partners, L.P.; Recovery Equity Investors II, L.P.; Recovery Equity Partners II, L.P.; Jeffrey A. Lipkin; and Joseph J. Finn–Egan (collectively referenced as "REI Defendants"); (2) Sidney H. Kosann (Kosann) and Norma J. Kosann; (3) James T. Potter, Jr. (Potter); and (4) Wayne Walton (Walton), who appears *pro se.*

### I. PROCEDURAL HISTORY

On March 14, 2000, an involuntary petition under Chapter 7 of the United States Bankruptcy Code was filed against Shelby Yarn Company (Shelby Yarn or Debtor). Wayne Sigmon (Trustee) was subsequently appointed as the Chapter 7 Trustee for the Debtor's estate. On April 9, 2002, an adversary proceeding was brought by the Trustee in Bankruptcy Court against the above-captioned Defendants. On September 20, 2002, the undersigned withdrew the reference of that proceeding to Bankruptcy Court. While the action has been in this Court, a third-party action was begun and subsequently dismissed. Order, filed January 6, 2004. In addition, by Order filed April 15, 2003, Counts XIV,

XVII, XXV, XXVII, and XXVIII were dismissed. Order, filed April 15, 2003. In addition, one Defendant, GMAC Commercial Credit, L.L.C., has been dismissed from the action. Order, filed September 2, 2003.

By motion for dismissal with prejudice, the Trustee has agreed to dismiss the following claims in the complaint:

(1) All claims against Norma J. Kosann;

(2) Counts I and II relating to the management agreement transfers, which involve claims made only against the REI Defendants;

(3) Counts III and IV alleging unlawful transfers to Kosann;

(4) Counts VII and VIII alleging unlawful transfers to Potter;

(5) Counts X and XI as to all Defendants except AGA and Goldstein;[1]

(6) Any claims in Count XII which are impacted by the dismissal of Count XI.

As a result of this motion, the following are the remaining claims as alleged in the complaint:

(1) Count IX alleging unlawful transfers to Defendant C.B. Planning;

(2) Count XII alleging the power of the Trustee to avoid any transfer not implicated by the dismissal of Count XI;

(3) Count XIII alleging violations of the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. §§ 2101, et seq., as to the REI Defendants, Kosann and Potter as employers; and, in the alternative, as the alter egos of Shelby Yarn;

(4) Count XV alleging that Shelby Yarn employees did not receive their unpaid wages in violation of the North Carolina Wage and Hour Act, N.C.

Gen.Stat. § 50–8, et seq., and should receive such payment from the bankrupt estate of Shelby Yarn as well as reasonable attorneys' fees to be paid by the REI Defendants, Kosann and Potter;

(5) Count XVI alleging that Shelby Yarn employees did not receive compensation for vacation benefits in violation of the North Carolina Wage and Hour Act, and should receive payment from the bankrupt estate of Shelby Yarn and that the REI Defendants, Kosann and Potter are liable for vacation benefits as employers;

(6) Count XVIII alleging violations of the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1162, as to the REI Defendants, Kosann and Potter as employers; and, in the alternative, as the alter egos of Shelby Yarn;

(7) Counts XX, XXI and XXII alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, et seq., as to the REI Defendants, Kosann, Potter, Walton, CB Planning and Sofer;

(8) Count XXIII alleging additional ERISA violations as to the REI Defendants, Kosann, Potter, CB Planning and Sofer, but excluding Walton; and

(9) Count XXIV alleging ERISA liability against the REI Defendants, Kosann, and Potter as the alter egos of Shelby Yarn.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be

---

1. The Trustee advises that a settlement with those Defendants is imminent.

awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra*). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "rea-sonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered." *Id.* (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)) (other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FINDINGS OF FACT

For the purposes of this Opinion, the Court, after consideration of the pleadings filed in this matter, makes the following findings of fact.

In 1994, Jeffrey Lipkin (Lipkin) and Joseph Finn–Egan (Finn–Egan) formed an investment fund known as Recovery Equity Partners II, L.P. (REP II), a Delaware limited partnership, of which Lipkin and Finn–Egan are the sole general partners. Affidavit of Joseph J. Finn–Egan, filed January 21, 2004, ¶ 4; Affidavit of Jeffrey A. Lipkin, filed January 21, 2004, ¶ 2. REP II is a fund which identifies and invests in underperforming companies and attempts to rehabilitate them at significant appreciation levels to the investors. Finn–Egan Affidavit, ¶ 2. REP II is the sole general partner of Recovery Equity Investors II, L.P. (REI II). Lipkin Affidavit, ¶ 2. REI II, a limited partnership based in California, is basically an investment fund specializing in rehabilitating troubled companies. Finn–Egan Affidavit, ¶¶ 2, 4.

The facility known as Shelby Yarn Company was previously Doran Textiles, Inc. (Doran) which in 1997 filed a Chapter 11 reorganization petition in Bankruptcy

Court. Lipkin Affidavit, ¶ 6. In 1997, REI II received permission from Doran's Bankruptcy Court to purchase the corporate assets. *Id.* In fact, REI II "created a Delaware corporation, 'New Dover, Inc.' which bought the Doran assets and later changed its name to Shelby Yarn Company (Shelby Yarn)." *Id.* REI II contributed $7 million to acquire the stock of New Dover/Shelby Yarn as well as loaning $2,250,000 for working capital. *Id.* REI II is the sole shareholder of Shelby Yarn, which is a Delaware corporation since New Dover was incorporated in Delaware and later changed its name to Shelby Yarn. *Id.,* ¶ 3. Lipkin and Finn–Egan were members of the board of directors of Shelby Yarn. *Id.,* ¶ 4. From July 30, 1997, through July 14, 1998, Lipkin was the secretary of Shelby Yarn, a position which he characterizes as "nominal"; and during the same period, corporate documents list him as the treasurer. *Id.,* ¶ 5.

Lipkin and Finn–Egan, through REI II, hired Kosann as the Chief Executive Officer (CEO) and Chairman of the Board for Shelby Yarn. *Id.,* ¶¶ 6–7. In July 1997, before the actual purchase of Doran had closed, Finn–Egan made notes in which he expressed his personal reservations about Kosann as the CEO.

> [Kosann] has been largely inactive in retirement and out of the textile business for at least ten years; he may ... have little understanding of how this business is now conducted .... [W]hat might have worked for Kosann when he was in the textile trades years ago may no longer be feasible, and this is crucial as direct push-thru marketing of specialized Doran yarns is key to Sid's program. [Kosann] has become an irrepressible advocate and active promoter of the deal with a strong personal agenda, rather than an independent, unprejudiced advisor to REI; while less obviously true, the same principle applies to

Potter and Norton, both of whom stand to gain a lot if REI buys Doran for Sid to run. He has from the onset made his case for the deal by force of personality and unrestrained pushiness rather than with facts, evidence and data; he has yet to produce the kind of comprehensive business plan REI would require of all others and, instead, has proffered only anecdotal fixes which ebb and flow with REI's approval[.] ... [Kosann] continues to charge REI very high consulting fees which were established when he was to act as our independent consultant and advisor, and before he became a direct beneficiary of the deal; he has become a promoter of the deal to us while on our payroll, which is unprecedented.

Exhibit 6, *attached to* Plaintiff's Appendix of Exhibits, filed February 6, 2004, at 63. Finn–Egan was also seriously concerned that REI had offered a bid which was too high for Doran's assets. *Id.,* at 65.

The purchase ultimately closed and Lipkin, Finn–Egan and Kosann constituted the entire board of directors for Shelby Yarn. Lipkin Affidavit, *supra.* Lipkin and Finn–Egan negotiated a new credit agreement with Doran's former bank, The Bank of New York (subsequently acquired by GMAC). *Id.,* ¶ 8. Deloitte & Touche was hired as the outside accounting firm and Hugh Crawford, a former Doran employee, was hired as controller. *Id.*

According to Lipkin,

> [b]ecause [Shelby Yarn] had acquired only Doran's assets and not its stock, it was not liable for any of Doran's unpaid expenses or claims, including at the time Doran's significant unpaid employee health insurance claims. However, in order to preserve employee morale and confidence, *we decided to cause* [Shelby Yarn] to voluntarily pay Doran's liability

for hundreds of thousands of dollars of such health insurance claims. In addition, pursuant to the recommendation of [Shelby Yarn's] management,[2] the company established an employee health benefit plan virtually identical to the former Doran plan. Under that plan, health care claims were partially funded by employee contributions and partially funded by the company itself. Claims were submitted to and adjudicated by an independent third-party claims administrator, which would periodically advise the company of the amount needed to pay health care providers for adjudicated claims. The company's contributions to the plan (up to a stop-loss limit) were not funded by commercial insurance purchased by the company. This made the plan what is commonly known as a "self-funded" plan.

*Id.,* ¶ 9 (emphasis and footnote added). The trustees of the Shelby Yarn Company Employees' Beneficiary Trust Agreement (Plan) were Kosann, Walton as the human resources director, and Potter, who apparently at some point became the Chief Operating Officer. *Id.,* ¶ 10.

Notes made by Finn–Egan show that early on there were problems with Kosann and his management of the company. In December 1997 there was concern that "Sid is understating profit for October by taking accruals[.]" Exhibit 6, *supra,* at 54. The same notes show that Finn–Egan was intricately involved in the management of the company, to the point of chastising Kosann. On May 29, 1998, Finn–Egan told Kosann "I had not heard that Dennis Poloff had left until yesterday; asked him in the future to advise me of any important developments; he promised he would." *Id.,* at 52. Finn–Egan's notes show contacts throughout each month with Kosann and other members of Shelby Yarn's management. At the July 1998 meeting of the Board of Directors, there was discussion of when "REI's $2.5M sub note [was] due" and the "[s]tatus of REI's $350K management and $375K bonus fees[.]" *Id.,* at 49. Discussion was had of competitors and possible product lines as well as the validity of patents. *Id.* Kosann reported that business was slow. *Id.,* at 50. Lipkin, who was apparently dissatisfied with the performance of some members of management, "talked to Werner re their poor preparation for today's meeting." *Id.,* at 51. Finn–Egan requested that at the board meeting in October 1998 several subjects be added to the agenda, including "cotton purchase commitments [and] analysis of uniform business/competition[.]" *Id.,* at 48. At the November 1998 Directors' meeting, Kosann asked for permission to pay a bonus to an employee and Finn–Egan noted "*we* left it in his discretion," presumably referring to Finn–Egan and Lipkin. *Id.,* at 44 (emphasis added). Discussion was had of a new patent owned by Shelby Yarn, testing being performed on the company's yarns, whether Wal–Mart and Target should be approached, failure of Kosann to "give clear answer[s] of where they are in sampling, ordering, etc., process." *Id.,* at 45. The meeting was followed up with a facsimile memorandum to Kosann about whether Shelby Yarn should do business with a particular supplier. *Id.,* at 42. Finn–Egan questioned Kosann's projected costs for a particular project, asking, "What is the real budget for this program[?]" *Id.,* at 43. "What does REI get for providing additional capital for the Veretta project and/or for additional working capital?" *Id.*

---

**2.** The identity of Shelby Yarn's "upper management" includes Kosann, Potter, Crawford and Walton. *Id.,* ¶ 11. Although Potter is described as the "Chief Operating Officer," during the same period of time Kosann is described as the CEO.

In January 1999, the monthly management fee was not paid to REI II due to cash flow problems and Finn–Egan queried, "does management share in pain?" *Id.,* at 41. Similar "hands on" involvement occurred in early 1999, including the March 1999 board meeting. *Id.,* at 38. Later that month, Finn–Egan responded to Kosann's request for fewer meetings of the board of directors by stating that "[i]n light of Shelby's operating performance, debt leverage and the need to deal with some unresolved management issues, I think more rather than less Board meetings are indicated." *Id.,* at 37. In April 1999, Finn–Egan requested information as to the base salary of Kosann and Potter, any annual bonus and the method of calculation and whether they had any percentage of "the fully diluted equity." *Id.,* at 36. Finn–Egan even complimented Walton on the company newsletter in May 1999. *Id.,* at 35. At the June 1999 meeting, Kosann reported the "future looks bright." *Id.,* at 34. Earlier that year, Shelby Yarn had hired Paul Petrov (Petrov) "to direct the company's sales and marketing efforts and to understudy Mr. Kosann as his successor." Lipkin Affidavit, ¶ 11. Nonetheless, throughout 1999, Shelby Yarn's financial status progressively declined due to a drop in sales and a strict adherence to lending policies by GMAC. *Id.,* ¶ 12. At some point during 1999, the controller, Crawford, left the company and a forensic accountant was retained to assist in the development of a plan to address cash flow problems. *Id.* Finn–Egan noted that Kosann had no real sales staff and made suggestions for adding sales representatives in order to increase orders. Exhibit 6, *supra,* at 34–35. By September 1999, the company was in financial distress and GMAC was demanding explanations. Kosann was directed by Finn–Egan and Lipkin to write the bank to explain that "he [Kosann] did not hide papers (as Hugh [Crawford] told the bank); he had been blindsided by Hugh's valuation memo, so he had collected all Hugh's papers so he could review them all before sending them to the bank." *Id.,* at 31. By October 1999, Finn–Egan noted that "[b]usiness is terrible," reporting in great detail as to "[w]hy business [is] so bad." *Id.,* at 30. That same month, Finn–Egan and Lipkin attended a "management meeting." *Id.,* at 29. Kosann and Petrov kept Lipkin and Finn–Egan apprized of the financial situation and finally made a trip to California in September 1999 to deliver rather dire news. Lipkin Affidavit, ¶ 13. After much negotiation among GMAC, REI II and Shelby Yarn, on October 27, 1999, REI II deposited $1,500,000 with GMAC as collateral in exchange for which GMAC would allow the company to continue to borrow under its line of credit. *Id.,* ¶ 14. By the time of a meeting in November 1999, discussion was underway to consider moving Shelby Yarn into the Mexican market. Exhibit 6, *supra,* at 27–29. Finn–Egan was frustrated with the failure of Kosann to turn the company around, noting that "[l]ess than one month ago management represented to GMAC and REI that the October restructuring would be the last accommodation needed." *Id.,* at 26. "Shelby has not shown a profit since we purchased it[.]" *Id.*

By mid-November 1999, Shelby Yarn's fortunes were even worse. Lipkin Affidavit, ¶ 15. Kosann and Petrov made another trip to California to deliver the news to Lipkin and Finn–Egan. *Id.* Although they requested another infusion of money, Lipkin and Finn–Egan "responded that REI II was not willing to make any decision about additional financial support until it had obtained an independent review of management's financial forecasts and business plans." *Id.,* ¶ 16. A firm was retained for that purpose in December 1999.

*Id.*, ¶ 17. On December 5, 1999, Finn–Egan received a report from Morris–Anderson & Associates which had been retained by REI to ascertain "ways in which REI can reduce liability with respect to Shelby Yarn Company." Exhibit 18, *attached to* Plaintiff's Appendix. In the report, Baker Smith, of Morris–Anderson, advised

> that you limit your liability by immediate removal of Sid [Kosann] and Paul [Petrov] from their officer duties and preferably from the premises and install MA & A as interim officers and crisis managers. The reasons for this recommendation are as follows:
>
>> Their interests (continued employment, identification with industry, strategic, etc.) are adverse to yours.
>
> .    .    .    .    .
>
>> Their continued mishandling of the borrowing base reporting, projections, presentations and lender relations would more likely lead to potential liability for you, whether justified or not.
>
> .    .    .    .    .
>
>> From a limitation of liability standpoint, [Shelby Yarn] is approaching the stage where you as owners and board members have an affirmative obligation to maximize the value of [Shelby Yarn] for all creditors, rather than an option of standing back and letting company management do what they will.

*Id.* Finn–Egan, Kosann and Lipkin continued to discuss the situation all through December 1999. During a meeting on December 10, 1999, Finn–Egan noted that

> Sid [Kosann] says that if REI doesn't invest and doesn't file, it will be protect-

ed from all obligations from the bank; (I don't know where Sid developed this). Ed [Hill of GMAC] said the bank will not rock the boat thru early January; he asked what REI might be willing to do with its stock if we don't invest and the bank carries the company alone. Sid the[n] went to Northey[3] and relayed the above; Sid said REI might want a tax loss on its shares and could get it by selling the shares to Sid for $1, and Sid would give REI a call on the shares so we could recover our investment[.]

Exhibit 6, *supra,* at 23 (footnote added). In fact, by this point, certain unidentified members of management were "very negative about Sid over some $75K issue and other matters; they insist that someone other than Sid manage the company[.]" *Id.,* at 24.

On December 15, 1999, Petrov advised Lipkin that GMAC had advanced sufficient funds to allow the company to meet its payroll due that same date. Lipkin Affidavit, ¶ 17. Sometime between December 15 and 17, 1999, Lipkin spoke separately with Kosann and Robert Tucker, an attorney for Shelby Yarn, about an $800,000 loan from REI II which would enable the company to reopen its doors after the holiday closing scheduled for December 17, 1999. *Id.,* ¶ 18. Lipkin "declined on behalf of REI II[.]" *Id.* Apparently the same request was made of GMAC with similar results. Lipkin reports that "Mr. Tucker called me again on December 17, 1999, to demand that either REI II provide funding for a restart by January 3, 2000, or the board of [Shelby Yarn] immediately close the company and terminate all employees." *Id.* Lipkin "again declined" and the company management placed its employees on a

---

**3.** John Northey, is an attorney with Underwood, Kinsey which represented Shelby Yarn. Exhibit 3, Deposition of Paul Petrov, *attached* to REI Parties' Appendix of Exhibits, filed January 21, 2004, at 108.

temporary layoff effective January 3, 2000. *Id.* At some point prior to December 27, 1999, Finn–Egan and Lipkin executed a written consent for Shelby Yarn to file bankruptcy with instructions that the consent should not be filed except on the authorization of Lipkin. Exhibit 3, *attached to* Finn–Egan Affidavit, at 22.

At the end of December 1999, Petrov had numerous discussions with Shelby Yarn's attorneys at the law firm of Underwood, Kinsey. Petrov Deposition, at 165–66. One of the attorneys at that firm, Russell Black, provided a draft of notices to be sent to the employees advising that the plant was going to be closed. *Id.* Petrov gave these to Kosann who "decided at that point he didn't want to send a memo that was quite that, worded in that way, because it was pretty definitive, the company is closing." *Id.* Petrov also testified that he was sure that the health insurance premiums collected by the company from the employees were held in a separate account which was not available to anyone to use for general company purposes. *Id.,* at 216. During his tenure at Shelby Yarn, Petrov knew that Kosann could not make official any decisions of import without the "blessing of REI." *Id.,* at 271.

At a January 7, 2000 meeting, no agreement for continued funding and financing for the company could be reached with either REI II or GMAC. Lipkin Affidavit, ¶ 20. Finn–Egan reported that he attended that meeting with Ed Hill, the GMAC representative, "Sid" [Kosann], "Paul" [Petrov], "Jeff" [Lipkin] and Larry Englert.[4] Exhibit 6, *supra,* at 20. Finn–Egan noted that "GMAC refused to advance any additional funds; *told them* that left no choice but to close the company and terminate employees tomorrow." *Id.* (emphasis add-

ed). It is not specified who actually delivered that ultimatum. During another meeting on that same date, Finn–Egan was advised by management that the payroll taxes were current and approximately $150,000 was owed for existing health insurance claims. *Id.,* at 21. The "management and directors" concluded that a Chapter 11 reorganization would not be feasible due to opposition from GMAC and it was determined to shut the plant down effective January 17, 2000. Lipkin Affidavit, ¶ 20. Shelby Yarn's "management notified employees of the closure by letter dated January 14, 2000[and] further notified employees that because of the closure the company's health plan would terminate effective January 17, 2000." *Id.,* ¶ 21.

After the plant was closed, Petrov contacted Finn–Egan requesting employment by REI. Exhibit 6, *supra,* at 19. During that conversation,

> [Petrov] asked if we would be interested in hearing about "improprieties" at Shelby; told him I don't know what that means; he said there may have been significant company monies spent on personal items; told him there usually are allegations like this when a company fails; told him we would be interested in seeing any evidence of such improprieties, if it exists; he said "OK" but nothing more.
>
> •       •       •       •       •
>
> Paul [Petrov] said that certain company monies were used to build Sid's house; we asked what is the amount; he said it is in the low 6 figures; he said something about Italian marble being purchased and charged to the company; he was very circumspect.

*Id.*

Kosann admitted to Finn–Egan in February 2000 that an invoice for $8,000 worth

---

4. The identity of this individual is not apparent; however, he may have been a member of a "crisis consulting" team hired to manage Shelby Yarn at some point.

of tile work done at his home had been sent to Shelby Yarn because the contractor had "mis-billed it." *Id.*, at 18. The Department of Labor performed an audit after the company closed and found that the Shelby Yarn health plan was short by $500,000, the portion owed by the company as a self-insurer. *Id.* Kosann told Finn–Egan that this stemmed from the original purchase of Doran's assets at which time $800,000 had been owed to the health plan. *Id.* Finn–Egan, when contacted by GMAC about these incidents, responded that

> we have been notified by various sources that there may have been improprieties at Shelby; to date, we have seen no evidence of that other than the "tiles" issue, which seems to have been an honest mistake and has been resolved; in response to these allegations, we are asking Underwood, our NC counsel, to talk with GMAC's lawyers to tell them (a) they may send in a forensic auditor to look at anything they want, and (b) Larry Englert and his firm are already managing the company on a day-to-day basis and have access to anything they want[.]

*Id.*, at 16. On February 10, 2000, Finn–Egan spoke with an agent of the United States Department of Labor concerning the health plan. *Id.*, at 14. The agent explained that under Shelby Yarn's plan, the employees' money was withheld and collected by the third party administrator and then the company was asked to pay in any unfunded balance. *Id.* At the time Shelby Yarn closed, the unfunded balance was approximately $585,000. *Id.* The agent also advised Finn–Egan that she had heard reports of improprieties involving renovations to the home of Potter's daughter, the investment of $100,000 of company money in warehouses, and payments made to a contractor who performed work at those warehouses as well as at personal residences. *Id.*, at 14.

Later that same month, Kosann determined that it would be too expensive to hire a local accounting firm to do Shelby Yarn's final tax returns and as a result, Kosann hired his personal accountants to do so. *Id.* However, by February 23, 2000, Shelby Yarn's attorneys advised Finn–Egan to have Kosann and Potter immediately leave the company's premises without taking any corporate records. *Id.*, at 13. This was accomplished.

On February 24, 2000, the federal agent again contacted Finn–Egan asking why "management had spent money renovating mills when it knew it didn't have enough cash to pay the health plan obligations[.]" *Id.*, at 11. The agent could not understand "why management would spend money on building repairs and renovations when the company [was] headed for illiquidity, especially when the parties paid were also doing work on Sid's and Potter's daughter's homes[.]" *Id.*, at 12. Finn–Egan responded that he was unaware of any such incidents. *Id.*, at 11. The agent advised that the health plan administrator had stopped processing any claims submitted after January 17, 2000, and that the final shortfall would be much greater than the original sum. *Id.*

Ultimately, the State Bureau of Investigation conducted a criminal investigation of Shelby Yarn and Kosann. *Id.*, at 10. Finn–Egan cooperated in that investigation and instructed his attorneys to do the same. *Id.* At some point during February 2000, Ed Hill of GMAC reported to Finn–Egan that witnesses had seen truckloads of equipment, which were the bank's collateral, being removed from the company. *Id.*, at 9. On March 6, 2000, Hill contacted Finn–Egan to advise that

> he and his forensic auditor had identified $500K of old inventory which Sid had boxed and reclassified as good inventory

in the borrowing base; [Hill] said they had identified $400K of equipment which had been sold out of the collateral base; [Hill thought] there may have been $150K spent on Sid's home and on Potter's daughter's home and charged to the company, but it is difficult to prove.... [Hill] said they had found REI's agreement to indemnify Sid for certain legal expenses; I told him we had no knowledge of any impropriety when we executed that; [Hill] agreed there is no onus on REI for that agreement.

*Id.*

On March 8, 2000, Finn–Egan refused to pay the consulting fee which Kosann had asked be wired to him. *Id.*, at 8. Finn–Egan learned the next day that the same contractor who had "mis-billed" Shelby Yarn for $8,000 worth of tile work done on Kosann's home had also done $250,000 worth of work for the company in 1999. *Id.*, at 7. By March 16, 2000, an involuntary petition in bankruptcy was unavoidable and Shelby Yarn's attorneys provided advice to Finn–Egan on what to expect. *Id.*, at 6. "Northey said he had strongly urged Sid weeks ago that no additional funds should go directly into Shelby, but Sid insisted that he be able to control all disbursements." *Id.*

At the time of the closing of the purchase of Doran's assets, REI II was paid $385,407.02 by Shelby Yarn to reimburse it for due diligence expenses. Exhibit D, *attached to* Lipkin Affidavit. Notes made by Finn–Egan indicate that a modification to the purchase agreement was made in order to "allow REP to recover prospective direct expenses[.]" Exhibit 6, *supra*, at 54. In addition, in November 1997, REI II was paid $58,333.34 for "management agreement fees." Exhibit D, *supra*. Thereafter, from December 1997 and throughout 1998, the monthly sum of $29,166.67 was paid for such fees. *Id.* The same monthly sums were paid from February through April, June and August 1999. *Id.* According to Lipkin, the "purpose of the management fees was to compensate REI II for certain strategic and financial consulting services and financial support that REI II provided to [Shelby Yarn] from time to time." Lipkin Affidavit, *supra*, ¶ 29. The total amount of money ultimately invested in Shelby Yarn by REI II was $11,038,000. Exhibit B, *attached to* Lipkin Affidavit. Lipkin also averred that "[a]side from participating in the hiring of Messrs. Kosann, Potter and Petrov, as required of directors under [Shelby Yarn's] bylaws and Delaware law because of the employment and stock option agreements being executed with those individuals, neither Mr. Finn–Egan nor I had any involvement with the hiring or firing of any [Shelby Yarn] employees." *Id.*, ¶ 31.

Pursuant to his employment contract with Shelby Yarn, Kosann was paid $350,000 per year as the CEO. Affidavit of Sidney H. Kosann, filed January 21, 2004, ¶ 7. His wife Norma, a salaried employee at Shelby Yarn from 1998 until the plant closed, earned $30,000 per year for duties involving marketing and promotional events. *Id.*, ¶ 10. Kosann determined not to provide a WARN notice to employees in December 1999 because "it would have been a self-fulfilling prophecy, as the issuance of this notice would have caused suppliers and customers of [Shelby Yarn] to look elsewhere for business." *Id.*, ¶ 18. After moving to Shelby, Kosann contracted with Rogers Contractors to build a home. *Id.*, ¶ 21. That same firm had performed "the maintenance and repair work for" Shelby Yarn. *Id.* He was unaware that Rogers had billed the company for work performed on the house and when he learned of this, he instructed

Rogers to reimburse the company and he then paid Rogers. *Id.*, ¶ 24.

## IV. DISCUSSION

### A. Standing of the Trustee to bring the adversary proceeding

■ The Defendants have renewed a motion attacking the standing of the Trustee in bankruptcy to bring this action. Not long after the withdrawal of the reference to the Bankruptcy Court, the Defendants moved to dismiss the action based on a lack of standing of the Trustee and/or the Special Committee of former employees to bring the claims asserted in the adversary proceeding. By Order filed April 15, 2003, the undersigned entered an exhaustive discussion of why standing was appropriate, finding (1) the Bankruptcy Court had the authority to appoint a committee to assist the Trustee in the prosecution of the non-core claims and that committee had standing to bring all the claims alleged; (2) the Trustee had standing to prosecute a WARN Act claim on behalf of the estate; (3) the Trustee had standing to prosecute a claim under the North Carolina Wage and Hour Act; and (4) the Trustee had standing to pursue ERISA and COBRA claims. Order, filed April 15, 2003, at 32–34.

Subsequent to that motion, the Bankruptcy Court modified the appointment of the special committee to limit their standing to the right to file a proof of claim on behalf of the former employees. Due to that modification, the undersigned amended its previous Order finding that the special committee had standing to bring the claims in the adversary proceeding. Order, filed May 16, 2003. Later, the Committee appointed by the Bankruptcy Court moved to intervene in this action and the Defendants opposed any such intervention. The Court denied the motion. Order, filed October 9, 2003. Now, the Defendants claim that only a committee may bring these claims despite the fact that they adamantly opposed intervention of the committee as a party earlier. The Court finds the Defendants are barred by their inconsistent postures. Their previous representations remain a matter of record; and, to the extent any recovery here is not *res judicata* as to the former employees, Defendants may indeed be subject to later, additional litigation. However, defense counsel made strategic choices to attack the standing of the committee in this action and now are compelled to live with the very ruling they previously requested. The motion for summary judgment based on standing is once again denied.

### B. The grounds raised in support of summary judgment

The primary issue for summary judgment purposes is whether each of the remaining Defendants was an "employer" for purposes of the WARN Act, the North Carolina Wage and Hour Act, COBRA and ERISA. If so, there is no need to reach the issues of alter ego and/or piercing of the corporate veil because that claim has been alleged in the amended complaint only as alternative relief. However, if, as the Defendants allege, the individual Defendants cannot be held liable as employers, those issues must be reached.

### C. Choice of law allegations

■ In order for the Defendants to be held liable under the causes of action based on the WARN Act, COBRA, ERISA and the North Carolina Wage and Hour Act, the Plaintiff must show that the Defendant to be charged was an employer. 20 C.F.R. §§ 639.2, 639.3 ("WARN requires employers who are planning a plant closing or mass lay-off to give affected employees at least 60 days' notice of such an employment action," and citing factors

for determining single versus separate employers); 29 U.S.C. § 1002(5) ("The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity" for purposes of COBRA and ERISA); N.C. Gen. Stat. § 95–25.2(5) (Employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employer."). The parties presume it will be necessary to apply alter ego and piercing of the corporate veil theories. As a result, they have exhaustively explored the choice of law applicable to those issues. Plaintiff argued there is no controlling federal law and thus North Carolina law should apply. Defendants respond that while Delaware or Third Circuit law should apply, since Shelby Yarn is a Delaware corporation, the similarity of the law renders the issue moot.

■ The parties, however, have overlooked a significant issue: jurisdiction in this Court is based on federal question jurisdiction, not diversity jurisdiction. The causes of action alleged are based on federal statutory rights with one pendent state law claim, the Wage and Hour Act cause, remaining in the action. Indeed, the action was withdrawn from a federal bankruptcy court. "This is a federal question case and [the Court] therefore [if necessary] look[s] to federal choice of law principles." *InterGen NV v. Grina*, 344 F.3d 134, 143 (1st Cir.2003) (internal citations omitted); *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25 (1st Cir.2000) (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981)). "If the federal statute in question demands national uniformity, federal common law provides the determinative rules

of decision. National uniformity is essential in the interpretation of [the law of employees' rights]." *Id.*, at 26 (citations omitted). The Court, therefore, finds it unnecessary to determine whether North Carolina or Delaware law applies since there is a fund of federal common law to address the issue. *Id.* Indeed, it may be unnecessary, based on the statutory definitions of employer, to even reach the issue of veil-piercing. *Administaff Cos., Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 458 (5th Cir.2003); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 483–84, 489–90 (3d Cir.2001) ("Further, although the importation of state law standards into federal law is permissible when state law is deemed to effectuate federal policy, state veil-piercing standards hardly seem likely to do so when such standards may generate inconsistency in an area of law that has always been characterized by insistence on uniformity."). Thus, as to the federal statutory claims, the Court finds there exists a fund of federal common law on the issues of alter ego and/or piercing of the corporate veil and that law will be applied to those claims. Obviously, as to the North Carolina Wage and Hour Act claim, North Carolina law will apply.

**D. Do the Defendants qualify as employers under the various statutes**

**1. The WARN Act**

■ In determining whether the Defendants were "employers," the Court considers the factors provided by the WARN Act regulations: "WARN requires employers who are planning a plant closing or mass lay-off to give affected employees at least 60 days' notice of such an employment action." "[S]ubsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their inde-

pendence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) *de facto* exercise of control (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. §§ 639.2, 639.3; *Pearson,* 247 F.3d at 489–90 (Applying the Department of Labor regulations "has the virtue of simplicity ... [and] allows for the creation of a uniform standard of liability for the enforcement of a federal statute." [M]ost importantly, the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and, unlike traditional veil-piercing and some of the other theories, focus particularly on circumstances relevant to labor relations.").

Lipkin and Finn–Egan are the sole general partners of REP II which is the sole general partner of REI II, the owner of all of Shelby Yarn's stock.[5] Lipkin, Finn–Egan and Kosann were the sole directors and Kosann was an officer of the corporation. Therefore, there is commonality of ownership and directors. *Childress v. Darby Lumber, Inc.,* 357 F.3d 1000, 1005–06 (9th Cir.2004) ("While technical common ownership is avoided by corporate formalities, this actual commonality of ownership satisfies this" factor.). There is no question that by the end of December 1999, and probably before, REI II had *de facto* control over Shelby Yarn. *Pearson,* 247 F.3d at 490 ("[T]he nominally separate corporations actually functioned as a single entity with respect to ... policies on a regular, day-to-day basis."). Lipkin and Finn–Egan negotiated the new credit terms at the initial purchase of Doran's

assets. They made the decision to take on the responsibility for Doran's unpaid health insurance claims. Finn–Egan on more than one occasion chastised Kosann's management and he was intricately involved with decisions relating to competition, new product lines, patents, etc. In November 1998, Kosann did not consider himself as having the authority to pay a bonus to an employee without the approval of Lipkin and Finn–Egan. Finn–Egan pressed Kosann to hire a potential CEO replacement. And, when Kosann wanted fewer meetings of the directors, Finn–Egan replied that based on the company's performance, more rather than less meetings were warranted. Finn–Egan was so involved that he felt compelled to complement Walton on the company newsletter. He instructed Kosann to explain to the bank why discrepancies reported by the previous controller were inaccurate. Petrov testified that Kosann could not make any decision of import without REI II's "blessing." *Childress, supra* ("[M]anagement of BRC 'would ultimately answer to higher management at Darby'[.]"). Lipkin and Finn–Egan both acknowledge that REI II's function was to provide "consulting" services, although those "services" were closely tied to management decisions. *Id.,* at 1006–07. And, by December 1999, they had hired an independent consultant to explore how to limit their personal, individual liability. In that report, they were advised to terminate Kosann in order to limit their exposure to personal liability as directors concerning the mishandling of the corporate borrowing base, projections and lender relations.

■ As to the actual failure to provide WARN Act notification, the REI II Defendants argue that they did not make the

---

5. Ownership of stock alone, however, is not ground for holding a parent liable. *Pearson, supra,* at 490.

decision to effect a temporary lay off on January 3, 2000, pointing out that the "management," *i.e.,* Kosann, made that decision. However, the above facts conclusively show that by December 1999, at the latest, Lipkin and Finn–Egan were intricately involved in every decision affecting the company. Moreover, Kosann had been hand-picked by REI II, Lipkin and Finn–Egan. *Pearson, supra.* Kosann admitted that he consciously determined not to send WARN notices to the employees because, as he put it, it would have been a death knell to the company. However, this does not render the REI II Defendants powerless or without responsibility to comply with WARN. The REI II Defendants openly acknowledge that the directors and management determined later that month to permanently close the plant. *Id.,* at 490 ("[T]he parent company directly exercised control over the particular policy at issue."); *Vogt v. Greenmarine Holding, L.L.C.,* 2004 WL 187153, *5 (S.D.N.Y.2004) ("The labor policy at issue in a WARN case is the decision to terminate the employment of a significant part of a company's work force."). REI II refused to provide any additional financial infusion. *Pearson,* 247 F.3d at 494 ("financial control will suffice."). REI II, Lipkin and Finn–Egan were intricately involved in almost every aspect of management "in the normal commercial sense." *Administaff Cos.,* 337 F.3d at 457 n. 1. Indeed, REI II, Lipkin and Finn–Egan specifically carried out the actual plant closing. *Id.; Vogt, supra,* at *6 ("Here, there are no allegations that the defendant entities controlled or even participated in the day-to-day personnel policies or daily labor operations of OMC[, such as hiring and firing]. The defendant entities are investment companies, not manufacturers of marine motors or indeed, anything at all.... The complaint does assert, however, that the defendant companies ... made the decision to effect the mass layoff of OMC employees in violation of the WARN Act notice provisions at the time the bankruptcy petition was filed. In the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy. Since the purpose of WARN, as its acronym implies, is to protect workers by encouraging employers to provide advance warning of plant closings, in a sense the *only* personnel policy that the statute is concerned with is the mass layoff decision."). REI II was clearly an employer. "To hold otherwise would not only flaunt the statutory language but would also invite resort to arrangements separating real estate and operational aspects of businesses solely to evade WARN." *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805, 808 (2d Cir.1992); *IBT v. AmerDel Serv. Co.,* 50 F.3d 770, 776 (9th Cir.1995) ("On the issue of 'single employer' status, the Union presented evidence that ADS did not adhere to corporate formalities, did not act indirectly through its Board of Directors, and did not make policy labor decisions without Ward's influence. How well the Union's evidence matches up against the contrary evidence presented by Ward and ADS we cannot say, for we cannot weigh evidence on this record; but we conclude the Union's evidence was sufficient to raise the general question whether Ward and ADS truly were 'separate employers' dealing with each other at arm's length."). Moreover, on this record, the Court cannot find that REP, REI and REP II are entitled to a summary judgment by making a finding that each is not an employer.

■■ The individual Defendants have moved for summary judgment arguing that under the WARN Act, an individual does not qualify as an employer and the alter ego theory does not apply to them. The motion filed by Potter contains no

citation to facts in support of his motion for summary judgment, merely incorporating the legal arguments made in Kosann's motion. This is insufficient to make a showing that there are no genuine issues of material fact since it is not incumbent on the Court to comb the record for the facts supporting Potter's claim. " 'Judges are not like pigs, hunting for truffles buried in briefs.' " *Teague v. Bakker*, 35 F.3d 978, 985 n. 5 (4th Cir.1994) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)).

■■■ As for the personal liability of Kosann, Lipkin and Finn–Egan, the Court finds each Defendant has failed to bring forth evidence warranting summary judgment in their favor.

[T]he federal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive. Federal courts are not bound by the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. Nor is there any litmus test in the federal courts governing when to disregard corporate form. Instead, the rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity.... Given the need to consider the purposes of the federal statute, [courts] have crafted what [they] termed a "less rigorous" veil-piercing standard tailored to ERISA [COBRA and WARN Act] cases in order the fulfill th[ose] statute[s'] goals.

*Locomotive Eng'rs*, 210 F.3d at 26–27 (internal quotations and citations omitted). While this circuit has never articulated the federal common law standard for piercing the corporate veil between an individual and a corporation, the Tenth Circuit has applied a two-prong test: "(i) was there such unity of interest and lack

of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations."

*Minnesota Laborers Health & Welfare Fund v. Scanlan*, 360 F.3d 925, 928, 2004 WL 235203, **2 (8th Cir.2004) (quoting *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993)); *Thomas v. Peacock*, 39 F.3d 493, 502–03 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349, 353–54, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) ("Because a rule of veil-piercing determined *who* is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law veil piercing" and adopted the Tenth Circuit test set forth above); *accord, United States v. Pena*, 731 F.2d 8, 12 (D.C.Cir.1984); *Flynn v. Greg Anthony Constr. Co., Inc.*, 2003 WL 22598297, *5 (6th Cir.2003) ("Consistent with the trend of federal courts to apply federal common law for assessing alter-ego liability in ERISA actions and with the D.C. Circuit's determination that courts should resort to the federal common law on piercing the corporate veil when a federal interest is implicated, it was proper for the D.C. District Court to evaluate Defendants' motion to dismiss ... using the ... federal common law with respect to piercing the corporate veil and alter-ego liability."). On the record before the Court, summary judgment is not appropriate.

### 2. COBRA and ERISA

■■■ "COBRA imposes a statutory requirement that a plan administrator notify 'any qualified beneficiary' of his or her right to continue health insurance coverage for up to eighteen months after a 'qualifying event.' " *McDowell v. Kraw-*

*chison,* 125 F.3d 954, 957 (6th Cir.1997). The definition of "employer" under CO-BRA is the same definition as applied in ERISA: "any person acting directly as an employer or indirectly in the interest of an employer, in relation to an employee benefit plan ...." *Id.,* at 961; 29 U.S.C. § 1002(5); *accord, Mary Helen Coal Corp. v. Hudson,* 235 F.3d 207, 212 (4th Cir. 2000). The statute also defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association or employee organization." 29 U.S.C. § 1002(9). For purposes of these statutes and for the reasons stated above, REI II, Lipkin, Finn–Egan, and Kosann were employers. There remains, as above, the issues of alter ego and/or corporate veil piercing as to each of these Defendants as well as REP, REI and REP II.

As previously noted, Potter has not properly supported his motion for summary judgment and, therefore, it must be denied. Walton, as well, failed to properly support his motion for summary judgment and, therefore, he remains a defendant in the ERISA claims alleged in Counts XX, XXI, XXII.

### 3. The North Carolina Wage and Hour Act

The North Carolina Wage and Hour Act defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." N.C. Gen.Stat. § 95–25.2(5). "This is the same definition as under the Fair Labor Standards Act," upon which the Wage and Hour Act was modeled. *In re Halperin,* 87 B.R. 399 (Bankr.W.D.N.C.1987); *Laborers' Int'l Union of North America v. Case Farms, Inc.,* 127 N.C.App. 312, 313, 488 S.E.2d 632 (1997). For the same reasons as set out above, the Court finds that

summary judgment in favor of REI II, Lipkin, Finn–Egan and Kosann cannot be granted. *In re Halperin, supra.* The record is insufficient to make a ruling as to REP, REI or REP II. Potter has failed to adequately support his motion and it must be denied.

### E. The motion to dismiss the ERISA claims based on lack of fiduciary status

"The parties agree that the [Plan] is governed by ERISA[.]" *ITPE Pension Fund v. Hall,* 334 F.3d 1011, 1013 (11th Cir.2003). "Certain persons, including those who 'exercise[ ] any authority or control respecting management or disposition of [Plan] assets,' bear fiduciary responsibility to an ERISA fund.... If a person breaches their fiduciary duties to an ERISA fund, he or she 'shall be personally liable to make good to such [Plan] any losses ... resulting from each such breach.'" *Id.* (quoting 29 U.S.C. §§ 1002(2)(A), 1109(a)) (other citations omitted). For the reasons previously explained, no Defendant is entitled to summary judgment as to this issue. The same reasoning applies to the claims that no breach of fiduciary relationship occurred. On the record before the Court, no Defendant would be entitled to summary judgment.

### V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' respective motions for summary judgment are hereby **DENIED.**

**IT IS FURTHER ORDERED** that the motion for voluntary dismissal with prejudice is hereby **GRANTED** and the Plaintiff's claims set forth in the motion are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the motion to exceed the page limit is hereby **GRANTED** *nunc pro tunc.*

**IT IS FURTHER ORDERED** that the Trustee shall advise the Court by filing an appropriate pleading if he intends to proceed against Defendant Walton at trial.[6]

---

6. The Plaintiff failed to respond to Walton's motion for summary judgment. Because it was not supported, the Court will not grant it. However, the failure of the Plaintiff to respond may be an indication of the seriousness, or lack thereof, of the claims against Walton, who was the human resources director of Shelby Yarn.