357 F.3d 1000
 Sharon CHILDRESS; Dwayne Springer; Mike Frisbie; Stuart Ingraham; Rick Buchanan; Scott Rotering; Phillip Cook; David Hall; Tari Conroy; Lyle Goracke; Robert Hackel; Gerald Behling; Brandon Zeiler; Ray Luchi; Randy Rennaker; Dan Wiseman, Jr.; Dan Wiseman, Sr.; Greg Holt; Steven Mossbrucker; and Dave Osborn, Plaintiffs-Appellees,
v.
DARBY LUMBER, INC. a Montana corporation; and Bob Russell Construction Inc. an Idaho corporation, Defendants-Appellants.
 No. 01-35764.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 2003.
 Filed February 6, 2004.
 
 1
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Richard A. Reep and Robert T. Bell of Reep, Spoon & Gordon P.C., Missoula, MT, for the defendants/appellants.
 
 
 2
 Lon J. Dale and G. Patrick HagEstad of Milodragovich, Dale, Steinbrenner & Binney, P.C. of Missoula, MT, for the plaintiffs/appellees.
 
 
 3
 Appeal from the United States District Court for the District of Montana; Donald W. Molloy, District Judge, Presiding. D.C. No. CV-99-16-M-DWM.
 
 
 4
 Before D.W. NELSON, THOMAS, Circuit Judges, and ILLSTON, District Judge.*
 
 OPINION
 ILLSTON, District Judge:
 
 5
 Darby Lumber and Bob Russell Construction, Inc. appeal the district court's grant of summary judgment in favor of Sharon Childress and other former employees in their action alleging violations of the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-09. At issue is whether the district court erred in: 1) concluding that Darby Lumber and Bob Russell Construction constituted a single employer for purposes of the WARN Act; 2) concluding that the companies were not exempt from the WARN Act's sixty-day notice requirement for mass layoffs; 3) deciding various discovery disputes; and 4) awarding attorney's fees. We conclude that the district court was not in error, and therefore affirm its ruling in full.
 
 BACKGROUND
 
 6
 This case arises under the Worker Adjustment and Retraining Notification Act. Id. Bob Russell Construction (BRC) was incorporated in the State of Idaho by Robert E. Russell (Russell) in 1976. In 1984, Darby Lumber, Inc. (DLI) was incorporated in the State of Montana. In January of 1996, DLI acquired 100% of the shares of BRC. At all times relevant to these proceedings, the stock of DLI was owned by Russell (approximately 49%) and the DLI Employees' Stock Ownership Trust (approximately 51%).
 
 
 7
 DLI operated as a lumber mill and manufactured, marketed, and sold finished lumber. BRC operated as a construction company, building log roads, hauling timber, and managing the log yard for DLI. During the period from September 17, 1997 to September 18, 1998, DLI employed 88 employees each with more than 1,000 hours of employment with the company. During the period from September 17, 1997 to September 18, 1998, BRC employed 18 employees each with more than 1,000 hours of employment with the company.
 
 
 8
 On September 24, 1998, Larry Guerrero, the general manager of the DLI mill, placed a written statement in the paychecks of all DLI employees, advising them of the financial difficulties of the company, and informing them that there would be a "major layoff." On September 25, 1998, DLI shut down the mill, and all mill employees were laid off. The planer operation at the mill continued to operate for several weeks thereafter, but was then shut down, and all of those employees were laid off. All of the employees of BRC were laid off over the next several months.
 
 
 9
 On February 8, 1999 this suit was filed by former DLI employees, alleging violations of the WARN Act, which requires a sixty-day notice of layoffs in certain situations. The WARN Act requires employers of 100 or more full-time employees to give at least sixty days advance notice of a plant closing if the shutdown results in an employment loss at a single employment site during any thirty-day period for fifty or more employees (excluding any part-time employees). Id. Appellants DLI and BRC asserted that the Act did not apply to them because each company had fewer than 100 full-time employees. Appellants further claimed that even if the WARN Act did apply, the affirmative defenses of "faltering company," "unforeseeable business circumstances," and/or "good faith" applied and would preclude application of the WARN Act. Appellees maintained that the two companies qualified as a "single employer" under the WARN Act, that the exceptions did not apply here, and that even if they did apply, WARN sanctions were warranted because the notice of termination was insufficient.
 
 
 10
 On cross-motions for summary judgment, the district court found, based on an analysis of the Labor Management Relations Act and WARN Act factors for determining single employer status, that "BRC and Darby Lumber are a single employer for the purposes of the WARN Act." Childress v. Darby Lumber, Inc., 126 F.Supp.2d 1310 (D.Mont. Jan.4, 2001)(order granting summary judgment). The district court went on to find that neither the good faith, business circumstances, nor faltering company exceptions applied. The district court then found that Darby Lumber would still be liable even if some of the exceptions applied, because its notice was inadequate. In subsequent orders, the Court granted plaintiffs' motion for attorney's fees in the amount of $123,033.44 and ordered defendants to pay damages to plaintiffs in the amount of $60,345.45, which was sixty work days of wages/benefits lost to the individual plaintiffs from the layoff date of September 25, 1998, minus any days worked.
 
 ANALYSIS
 I. Application of the WARN Act
 
 11
 A district court's grant of summary judgment is reviewed de novo. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987). "A grant of summary judgment is reviewed de novo to determine whether, viewing the evidence in a light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court applied the relevant substantive law." Tzung v. State Farm Fire and Cas. Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 A. WARN Act Overview
 The purpose of the WARN Act is to provide:
 
 12
 protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.
 
 
 13
 20 C.F.R. § 639.1. Employers with 100 or more full-time employees are barred from ordering a plant closing or mass layoff "until the end of a 60-day period after the employer serves written notice of such an order to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee." 29 U.S.C. § 2101(a), 2102(a)(1).
 
 
 14
 Under the WARN Act, the term "mass layoff" means a reduction in force which:
 
 
 15
 (A) is not the result of a plant closing; and
 
 
 16
 (B) results in an employment loss at the single site of employment during any 30 day period for —
 
 
 17
 (I) (I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or
 
 
 18
 (ii) at least 500 employees (excluding any part-time employees)
 
 
 19
 Id. § 2101(a)(3). These figures are calculated from the "snap-shot" date of the last date upon which the notice would be required to be given, in this case, July 27, 1998, sixty days before September 25, 1998, the date of the layoff. See 20 C.F.R. § 639.5(a)(2). On July 27, 1998, DLI and BRC had more than 100 employees combined, while alone, each company had fewer than 100 employees.
 
 
 20
 B. "Single employer" analysis of DLI and BRC
 
 
 21
 Appellants contend that there was significant evidence to establish that DLI and BRC were separate companies, neither of which independently employed 100 employees. Int'l Bhd. of Teamsters v. American Delivery Serv. Co., 50 F.3d 770 (9th Cir.1995) analyzed the single employer test for the WARN Act and the Labor Management Relations Act together:
 
 
 22
 To determine "single employer" status under the LMRA, we consider these four factors: (1) common ownership; (2) common management; (3) centralized control of labor relations; and (4) interrelation of operations.
 
 
 23
 Common ownership is the least important factor, and the remaining three factors are guideposts only. Single employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arms length relationship found among unintegrated companies.
 
 
 24
 . . .
 
 
 25
 The relevant regulations under WARN provide that Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending on the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.
 
 
 26
 Id. at 775 (quoting 20 C.F.R. § 639.3(a)(2), internal citations omitted). The five WARN factors are analyzed as follows.
 
 
 27
 i. Common ownership
 
 
 28
 BRC is the wholly owned subsidiary of DLI. While appellants deny common ownership, they admit that DLI owns 100% of the shares of BRC, and that Russell owns 49% of the shares of DLI and is the trustee for the other 51% of the shares. While technical common ownership is avoided by corporate formalities, this actual commonality of ownership satisfies this "least important factor." Id.
 
 
 29
 It is undisputed that BRC and DLI share common directors and officers, as appellants admitted in their responses to plaintiffs' discovery requests.
 
 
 30
 ii. Common directors and/or officers
 
 
 31
 iii. De facto exercise of control
 
 
 32
 The parties contest the extent of DLI's de facto control over BRC. Appellants assert that the companies maintained separate employment policies, had separate managers, and had separate workforces with separate pay scales, payrolls, workers compensation, employee health benefits, and separate middle management. Appellees rejoin that DLI's manager was given daily reports on the activities of both DLI and BRC, and at times directed the activities of BRC. DLI's manager made the decision to move employees from the payroll of DLI to that of BRC, and to have employees on the BRC payroll work in the DLI log yard. Russell admitted in his deposition that he directed both the DLI manager and the BRC manager to shut down the respective companies when the time came. Finally, appellants admitted in discovery responses that management of BRC "would ultimately answer to higher management at Darby Lumber, Inc."
 
 
 33
 This Court agrees with the district court that these factors, on balance, demonstrate de facto exercise of control by DLI over BRC.
 
 
 34
 iv. Unity of personnel policies emanating from a common source
 
 
 35
 Appellees do not seriously dispute appellants' showing of significant differences in personnel policies between DLI and BRC, including differences in overtime, breaks, methods of pay, and health insurance premiums.
 
 
 36
 v. Dependency of operations
 
 
 37
 Appellees maintain that BRC's operation was overwhelmingly dependent on DLI. Citing deposition testimony that over ninety percent of BRC's activities and revenues were derived from DLI in 1998, appellees argue that BRC's main purpose was to provide support services for the DLI mill. In addition, BRC maintained its financial records at DLI's facilities, and, as previously noted, some BRC employees worked in the DLI log yard.
 
 
 38
 Appellants counter that Russell, in his affidavit, declared that BRC was not dependent:
 
 
 39
 BRC was not dependent upon DLI for its operational existence. BRC existed as a viable operating company for many years before DLI even came in to being. The services BRC provided such as road building, hauling, trucking and delivery could easily have been provided to entities other than DLI. In fact, they were provided to others for many years before DLI existed and continued after DLI closed.
 
 
 40
 However, although Russell states that BRC "could easily have" provided these services to others, the facts demonstrate that while DLI and BRC were both in existence, BRC regularly provided these services almost exclusively to DLI. Further, BRC shut down operations just months after the DLI mill closed, suggesting that BRC was dependent upon DLI for business.
 
 
 41
 Accordingly, the evidence demonstrates dependency of operations between DLI and BRC.
 
 
 42
 The relevant factors, taken as a whole, support the district court's finding that BRC and DLI operated as a single employer for the purposes of the WARN Act, and that the WARN Act applies to their conduct.
 
 
 43
 II. Exceptions to the WARN Act's sixty-day notice requirement
 
 
 44
 Appellants contend that they were exempt from the WARN Act's sixty-day notice requirement for layoffs under either the "good faith" exception, the "business circumstances" exception or the "faltering company" exception, and that the district court erred in not allowing these defenses to go to a jury.
 
 A. Good faith exception
 The WARN Act provides:
 
 45
 If an employer which has violated this Act proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.
 
 
 46
 29 U.S.C. § 2104(a)(4). Appellants claim that this defense should have gone to a jury, and that the district court's decision to dismiss it at the summary judgment stage was reversible error.
 
 
 47
 However, as the district court recognized, good faith is an affirmative defense as to which defendants have the burden of proof, and in this case they failed to raise triable issues as to several elements of the defense. As the district court stated:
 
 
 48
 The good faith defense requires a showing by the employer of a subjective intent to comply with the Act as well as evidence of objective reasonableness by the employer in applying the Act. In re Jamesway Corp., 235 B.R. 329, 345 (S.D.N.Y.1999). If there is not a material fact issue concerning one or both of these factors, good faith can be a matter appropriate for summary judgment. Id. Under the good faith exception, the employer must establish that it had "an honest intention to ascertain and follow the dictates of the [statute]" and that it had "reasonable grounds for believing that [its] conduct complie[d] with the [statute]." Local 246 Utility Workers Union of America v. Southern California Edison Company, 83 F.3d 292, 298 (9th Cir.1996). Childress, 126 F.Supp.2d at 1315 (D.Mont.2001)(order granting summary judgment)(alterations in original).
 
 
 49
 Appellants failed to provide facts to establish that they had an honest intention to ascertain and follow the dictates of the WARN Act or that they had reasonable grounds for believing that their conduct complied with it. Appellants did provide evidence that they had little or no knowledge of the Act and that Russell did not want to close the DLI mill. That information tends to show that defendants were ignorant of the WARN Act; it does not, however, show that they had an honest intention to follow it, or that they had grounds for believing that they were in compliance with it. Mere ignorance of the WARN Act is not enough to establish the good faith exception. The district court was correct in finding that the good faith exception to the WARN Act did not apply.
 
 B. Business circumstances exception
 
 50
 The WARN Act's sixty-day notice requirements do not apply "if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The Code of Federal Regulations gives guidance on what types of business circumstances will be considered "not reasonably foreseeable":
 
 
 51
 (1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.
 
 
 52
 (2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.
 
 
 53
 20 C.F.R. § 639.9(b)(1)-(2).
 
 
 54
 Appellants point to the decision by U.S. Bank on September 7, 1998, refusing to rewrite DLI's credit, as the sudden and unforeseeable event that caused the shutdown of the mill. However, appellants' own response to a discovery request stated:
 
 
 55
 The closure of the plant and layoffs in September 1998 was occasioned by losses to the company which could not be sustained any longer. These losses were a function of the depressed lumber market, increased cost of raw materials, operational difficulty in the startup of a new planer, and factors effected by the price of raw materials and finished goods beyond the control of Darby Lumber, Inc. In turn, raw materials and finished goods markets and prices were effected by the general economic downturn in Pacific rim countries, influences by NAFTA, and significantly influenced by environmental pressure to halt sales of forest service timber.
 
 
 56
 This statement makes it evident that the plant closure was not caused solely by the decision of U.S. Bank, but was caused by a variety of factors which accumulated over time, making the closure foreseeable. Indeed, as the district court noted, while U.S. Bank decided not to rewrite DLI's loans on September 7, 1998, the company did not actually lose its credit with the bank until November 1998, a month following the mass layoff.
 
 
 57
 Appellants failed to meet their burden of showing that the business circumstances exception applies in this case. Accordingly, we affirm the district court's finding that the business circumstances exception did not apply.
 
 C. Faltering company exception
 
 58
 The Code of Federal Regulations, at 20 C.F.R. § 639.9(a), outlines the requirements for the faltering company exception. It first notes that the exception "applies to plant closings but not to mass layoffs and should be narrowly construed." Id. It goes on to provide that the exception generally allows for reduced notice to employees where (1) the employer was actively seeking capital at the time that sixty-day notice would have been required; (2) there was a realistic opportunity to obtain the financing sought; (3) the financing would have been sufficient, if obtained, to enable the employer to keep the facility open for a reasonable period of time; and — most critically here:
 
 
 59
 (4) The employer reasonably and in good faith ... believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close. This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs.
 
 
 60
 Id. § 639.9(a)(4).
 
 
 61
 Appellants seek to qualify for this "faltering company" exception because they were in the process of seeking a line of credit from U.S. Bank. However, even assuming that there was a realistic opportunity to obtain such financing, and that the financing, if obtained, would have enabled them to avoid or postpone the closure of the mill, appellants provided no evidence that they reasonably and in good faith believed that giving the sixty-day notice to their employees during the negotiations with U.S. Bank would have precluded them from obtaining the credit from the bank. The district court's ruling that the faltering company exception does not apply in this case was not in error, and is hereby affirmed.
 
 III. Discovery disputes
 
 62
 Decisions on discovery issues are reviewed for abuse of discretion. U.S. v. Bourgeois, 964 F.2d 935, 937 (9th Cir. 1992).
 
 
 63
 A. Denial of protective order regarding scheduling of depositions
 
 
 64
 Appellants sought a protective order from the district court that would require the rescheduling of the depositions of two witnesses aligned with appellants to a time which would not impose undue hardship on the witnesses. The district court denied the requested order, after appellees demonstrated that substantial efforts had been made to accommodate the witnesses' schedules and that neither the witnesses nor defense counsel had timely responded to the scheduling efforts.
 
 
 65
 The district court did not abuse its discretion.
 
 B. Discovery sanctions
 
 66
 Appellants maintain that the district court abused its discretion by sanctioning them for failing to provide documents in response to a subpoena duces tecum served upon DLI's former in-house accountant. The documents sought by the subpoena, financial records of BRC and DLI, were not produced at the ex-employee's deposition. Appellants maintain that because the witness was no longer an employee of DLI, she no longer had lawful access to those documents, and that it was an abuse of discretion for the district court to sanction defendants for the failure to bring those documents to the deposition.
 
 
 67
 The witness left DLI, however, only three weeks before her deposition, and she had worked with or authored many of the documents sought. The district court was informed that in advance of her deposition, she contacted one of the officers of DLI and asked whether she should bring those documents to her deposition. The officer told the witness that she did not have authorization from DLI to bring the documents. Under these circumstances, it was not an abuse of discretion for the district court to order defendants to pay costs, expenses, and reasonable attorney's fees incurred by plaintiffs in deposing the witness without the subpoenaed documents.
 
 
 68
 Appellants also assert that the district court erred in the amount of attorney's fees awarded to appellees for their work on various discovery motions, citing Chalmers v. City of Los Angeles, 796 F.2d 1205 (9th Cir.1986). District courts may reduce attorney's fees if the court finds that they are duplicative or unreasonable. Sorenson v. Mink, 239 F.3d 1140, 1146 (9th Cir.2001). In this instance the district court found all the awarded fees to be warranted. Appellants have not demonstrated that it was an abuse of discretion by the district court to award $10,770.20 in costs, expenses, and attorney's fees.
 
 
 69
 C. Denial of motion to compel discovery responses
 
 
 70
 The district court denied defendants' motion to compel discovery responses on the ground that there had been no good faith conference. Defendants object that a Certification of Good Faith Conference was filed with the court. However, the district court stated in the order denying defendants' motion to compel that "the good faith requirement of Local Rule 200-5-(e)(2)... mandates that the parties confer on all disputed issues before the motion is filed," and obviously found that this had not been done. Defendants provide no record of what issues the parties discussed at their good faith conference, and there is no basis to find that the district court abused its discretion.
 
 D. Refusal to exclude expert opinions
 
 71
 Appellants assert that the district court should have excluded the opinions of appellees' expert, Dr. Vinso, because appellees failed to comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B). However, appellees did file a disclosure statement for Dr. Vinso, which lacked detail and specificity only because appellants had failed to provide documents during discovery. Dr. Vinso's report was made available to appellants shortly after plaintiffs received the relevant information from appellants. Appellants have provided no evidence demonstrating that the district court's denial of their motion to exclude expert opinions was an abuse of discretion.
 
 IV. Attorney's Fees Award
 
 72
 The WARN Act provides that in suits under the act "the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs." 29 U.S.C. § 2104(a)(6). The district court awarded $123,033.44 in attorney's fees to the appellees, as the prevailing parties, and denied any fees to appellants, even though they prevailed as to two individual plaintiffs. Appellants contend that both decisions were erroneous.
 
 
 73
 The legal analysis underlying a fee decision is reviewed de novo, Webb v. Ada County, Idaho, 195 F.3d 524, 526 (9th Cir.1999), but a district court's grant or denial of fees is reviewed under an abuse of discretion standard. See Shaw v. City of Sacramento, 250 F.3d 1289, 1293-94 (9th Cir.2001); Native Vill. of Venetie IRA Council v. Alaska, 155 F.3d 1150, 1151 (9th Cir.1998).
 
 A. Denial of fees to defendants' counsel
 
 74
 Appellants claim that they were entitled to fees under WARN, since defendants prevailed on claims of two individual plaintiffs and on plaintiffs' motion for class certification. These victories do not, however, make appellants the "prevailing party":
 
 
 75
 Under the test articulated in Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), "a plaintiff `prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." The Court explained that a "material alteration of the legal relationship occurs [when] the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." Id. at 113, 113 S.Ct. 566. In these situations, the legal relationship is altered because the plaintiff can force the defendant to do something he other-wise would not have to do.
 
 
 76
 Fischer v. SJB P.D. Inc., 214 F.3d 1115, 1118 (9th Cir.2000) (alteration in original). As appellees obtained a $60,345.45 judgment against appellants, appellees clearly prevailed under this definition. The attorney's fees standards from cases such as Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), Hughes v. Rowe, 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), and Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), provide that prevailing defendants are awarded attorney's fees only when the plaintiffs' claims were frivolous, unreasonable, or without foundation. See, e.g., Christiansburg, 434 U.S. at 421, 98 S.Ct. 694.
 
 
 77
 B. Amount of fee award to plaintiffs' counsel
 
 
 78
 Appellants argue that the district court awarded excessive attorney's fees to plaintiffs, since plaintiffs' total recovery was $60,345.45 but the court awarded $123,033.44 in attorney's fees, using the lodestar method. The district court did not err in calculating the fees based on the lodestar method, in reliance on Hensley, 461 U.S. at 433, 103 S.Ct. 1933 (stating that a good starting point is the number of hours reasonably expended multiplied by a reasonable hourly rate) and City of Burlington v. Dague, 505 U.S. 557, 562-67, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (holding both that there is a strong presumption that the lodestar represents a reasonable fee, and that whether a fee is fixed or contingent should have no bearing on the lodestar calculation). Extensive case authority supports the district court's use of the lodestar in this case.
 
 CONCLUSION
 
 79
 This Court AFFIRMS the rulings of the district court in full.
 
 
 
 Notes:
 
 
 *
 The Honorable Susan Illston, United States District Judge for the Northern District of California, sitting by designation