22 A.3d 27 (2011)
420 N.J. Super. 438
Patrick DEROSA and Chris Schaub, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
ACCREDITED HOME LENDERS, INC.; Accredited Home Lenders Holding Company; James M. Moran, Chief Executive OfficerAccredited Home Lenders, Inc.; Jeffrey Walton, President and Chief Operations Officer Accredited Home Lenders, Inc.; and LSFV Accredited Investments, L.L.C., Defendants, and
Lone Star Fund V (USLP) and Hudson Advisors, L.L.C., Defendants-Respondents.
No. A-3727-09T3.
Superior Court of New Jersey, Appellate Division.
Submitted April 12, 2011.
Decided June 14, 2011.
*30 O'Brien, Belland & Bushinsky, L.L.C., attorneys for appellants (Robert F. O'Brien, Cherry Hill, on the brief).
Archer & Greiner, P.C., and Sean M. Becker (Vinson & Elkins, L.L.P.), of the Texas bar, admitted pro hac vice, attorneys for respondents (Mr. Becker and *31 David A. Rapuano, Haddonfield, on the brief).
Before Judges CARCHMAN, WAUGH and ST. JOHN.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
The Millville Dallas Airmotive Plant Job Loss Notification Act, N.J.S.A. 34:21-1 to -7 (the New Jersey WARN Act or the Act), generally provides that under certain conditions employees are entitled to notice, or alternatively, severance pay, in the event of a transfer or termination of operations, or a mass layoff by an employer. This appeal requires us to consider the novel question of whether the Act applies to parent and affiliated companies. We conclude that consistent with its federal analogue, The Worker Adjustment and Retraining Notification Act of 1988 (the federal WARN Act), 29 U.S.C.A. §§ 2101 to -2109, the New Jersey Act does apply to parent and affiliated companies, and in reaching this conclusion, we adopt the "five-factor" test enunciated in 20 C.F.R. § 639.3(a)(2). Accordingly, we reverse the order of the Law Division dismissing plaintiffs' complaint and remand for further proceedings.

I.
These are the relevant facts presented to the Law Division on the motion of summary judgment. Defendant Accredited Home Lenders, Inc. (Accredited) was engaged in issuing and servicing sub-prime mortgages. Its headquarters was located in San Diego, California, and it employed more than 100 people at offices located throughout the United States. According to Mark Mohan, Accredited's division manager and head of the company's Woodcliff Lake office (the office), the office transacted the company's wholesale mortgage business in the eastern United States (from Maine to Virginia, and west to Pennsylvania). The parties dispute the number of people employed in the office, and the number of employees discharged as a result of the office closure on June 4, 2008.[1]
Defendant Lone Star Fund V (USLP) (LSFV) is a private equity fund "that acquires distressed debt and equity assets including corporate, commercial real estate, single family residential and consumer debt products as well as banks and operating companies." It is organized as a limited partnership, and it has never had any employees. It is controlled by its general partner, Lone Star Partners V, L.P., which in turn is controlled by its general partner, Lone Star Management Co. V, itself controlled by its sole owner, defendant John Grayken, the chief executive officer of LSFV. Grayken "has been the primary individual responsible for formulating investment strategy for the funds. He serves as the president of all *32 the corporations that serve as general partners of each of the . . . Lone Star private equity funds. . . ."
Defendant Hudson Advisors, LLC (Hudson) was created for the purpose of managing and servicing the assets acquired by the private funds sponsored by LSFV. It is located in the same building as LSFV in Dallas, Texas, and Grayken is its sole beneficial owner.
In 2006, LSFV began investigating opportunities for an acquisition or investment in a sub-prime mortgage lender. Through its subsidiaries, LSFV acquired Accredited. The acquisition revealed a series of interlocking relationships that are relevant to the issue before us. Specifically:
1) LSFV is the parent corporation of LSFV Accredited Holdings, Inc. (LSFV Holdco); it owns a 63.7113% interest, with the remaining percentages owned by LSFV affiliates-LSFV International Finance, L.P., Hudco (Global) V, L.P., and Hudco Partners V (Americas), L.P.[2];
2) LSFV Holdco is the parent corporation of defendant LSFV Accredited Investments, LLC (LSFV Accredited);
3) Both LSFV Holdco and LSFV Accredited were created for the purpose of purchasing Accredited;
4) In October 2007, LSFV Accredited acquired Accredited Holding, which is the parent of Accredited. LSFV guaranteed the funds for the acquisition, and the stated purpose of the acquisition was for LSFV to "indirectly . . . acquire control of, and the entire equity interest in" Accredited Holding.
Effective October 12, 2007, Accredited Holding, Hudson, and LSFV, entered into an asset advisory agreement. Pursuant to the agreement, Hudson began evaluating Accredited's business, including meeting with Accredited executives and requesting a variety of information. LSFV was not a passive partner. Plaintiffs Patrick DeRosa and Chris Schaub described LSFV's presence at Accredited's sales meetings in early 2008. Mohan related requests for information he received on behalf of LSFV; he also expressed the opinion that after LSFV's purchase of the company, Accredited's senior managers were no longer "calling the shots."
A determination was made (the parties dispute by whom) to shut down much of Accredited's operations, including the office. Legal advice was obtained with respect to the shutdown, including what obligations existed under the relevant state and federal WARN Acts, and counsel advised that there were no obligations under the New Jersey WARN Act.
Michael Prushan, Hudson's director of portfolio management, started with Hudson on March 1, 2008. He was involved in evaluating Accredited's business as well as planning and implementing the shutdown. On June 4, 2008, Prushan traveled to the office to announce its closure. He was accompanied by an employee assistance advisor and a security guard.
According to Mohan, Prushan identified himself as an employee of "Lone Star," and he displayed a "Lone Star" security badge. Prushan, however, claims that he introduced himself as a Hudson employee, and when Mohan asked what Hudson was, Prushan explained that Hudson performed services for "Lone Star."
No advance notice was given of the shutdown. Employees present on-site were assembled in one location, advised of the *33 shutdown, and informed that they had one hour to pack their belongings and leave the premises. The employee assistance advisor provided them with handouts entitled "Post Trauma `Do's and Don'ts'" and "Information for Exiting Employees." Employees in the field were called with the news.
Other Accredited offices were also shut down, and its senior managers were discharged. WARN notices were provided to some of those discharged employees but not others.
Plaintiffs were among the office employees discharged without notice or severance pay. DeRosa was employed by Accredited, at the office, for approximately five years-four years between February 2002 and May 2006, and another year between June 2007 and June 4, 2008. After his termination, he was unemployed for approximately fifteen months and he received unemployment compensation for approximately ten months.
Schaub was employed by Accredited for approximately eight-and-a-half years, between December 1999 and June 4, 2008, with his last assignment in the office. After his termination, he was unemployed for approximately three months and did not apply for unemployment compensation during that period.
DeRosa, Schaub, and Mohan conceded that they never had a direct employment relationship with LSFV. They did not report to anyone at LSFV, they never received a paycheck or employee handbook or employee benefits from LSFV, and they never identified LSFV as their employer on any government documents (i.e., taxes or unemployment compensation forms).
Plaintiffs filed a putative class action against defendants, including James M. Moran, the chief executive officer of Accredited, and Jeffrey Walton, Accredited's president, alleging violations of the New Jersey WARN Act as well as the New Jersey Wage Payment Law, N.J.S.A. 34:11-2 to -33.6. Thereafter, Accredited and Accredited Holding filed for bankruptcy and were dismissed as defendants. For reasons not explained in the record, all remaining defendants with the exception of LSFV and Hudson were dismissed without prejudice, and the action proceeded against LSFV and Hudson.
On motions for summary judgment, defendants asserted that they were not subject to the Act. The motion judge declined to treat Accredited and its various affiliated corporations as a single employer and thus dismissed plaintiffs' complaint, concluding that the Act did not apply. In granting summary judgment, the trial court held that the New Jersey WARN Act's definition of "employer" should be read narrowly, as limited to direct employers, and it did not encompass parent corporations or affiliated businesses. This appeal followed.

II.
On appeal, plaintiffs contend the trial court erred in granting summary judgment to LSFV and Hudson and dismissing the New Jersey WARN Act claim asserted against them, on the ground that they could not be considered plaintiffs' "employer" as that term is defined under the Act.

A.
Our review of a summary judgment motion is de novo. We apply the same standard as the trial court, Chance v. McCann, 405 N.J.Super. 547, 563, 966 A.2d 29 (App. Div.2009), and determine whether the evidence presented, when viewed in the light most favorable to the non-moving party, is sufficient to permit a rational factfinder to resolve the disputed issues in favor of the non-moving party. R. 4:46-2(c); Brill v. *34 Guardian Life Ins. Co. of Am., 142 N.J. 520, 539-41, 666 A.2d 146 (1995). If there is a genuine issue as to any material fact, or credibility issues are presented, summary judgment should be denied. R. 4:46-2(c); Brill, supra, 142 N.J. at 540, 666 A.2d 146. On the other hand, if the evidence is "`so one-sided that one party must prevail as a matter of law,'" then summary judgment should be granted. Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). Where the issue in dispute involves a legal question and interpretation of a statute, our review is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).

B.
The New Jersey WARN Act is of recent vintage. It was adopted effective December 20, 2007. L. 2007, c. 212, § 1. Under certain conditions, the Act requires that employees receive notice, or alternatively severance pay, in the event of a transfer or termination of operations, or a mass layoff by an employer. N.J.S.A. 34:21-2. Specifically, the Act provides that:
If an establishment is subject to a transfer of operations or a termination of operations[3] which results, during any continuous period of not more than 30 days, in the termination of employment[4] of 50 or more full-time employees,[5] or if an employer conducts a mass layoff,[6] the employer who operates the establishment or conducts the mass layoff shall:
a. Provide, in the case of an employer who employs 100 or more full-time employees, not less than 60 days, or the period of time required pursuant to the federal "Worker Adjustment and Retraining Notification Act," 29 U.S.C. § 2101 et seq., or any amendments thereto, whichever is longer, before the first termination of employment occurs in connection with the termination or transfer of operations, or mass layoff, notification of the termination or transfer of operations or mass layoff to the Commissioner of Labor and Workforce Development, the chief elected official of the municipality where the establishment is located, each employee whose employment is to be terminated and any collective bargaining units of employees at the establishment;

*35 b. Provide to each full-time employee whose employment is terminated and to whom the employer provides less than the number of days of notification required pursuant to subsection a. of this section, severance pay equal to one week of pay for each full year of employment.. . .
c. Provide the response team with the amount of on-site work-time access to the employees of the establishment that the response team determines is necessary for the response team to carry out its responsibilities pursuant to section 5 of this act.
In determining whether a termination or transfer of operations or a mass layoff is subject to the notification requirements of this section, any terminations of employment for two or more groups at a single establishment occurring within any 90-day period, when each group has less than the number of terminations which would trigger the notification requirements of this section but the aggregate for all of the groups exceeds that number, shall be regarded as subject to the notification requirements unless the employer demonstrates that the cause of the terminations for each group is separate and distinct from the causes of the terminations for the other group or groups.
[N.J.S.A. 34:21-2.]
The required content of the notice is set forth at N.J.S.A. 34:21-3. There is a private right of action for violations of the Act, N.J.S.A. 34:21-6, which is in addition to an employee's rights under a collective bargaining agreement. N.J.S.A. 34:21-4.
The term "employer" is defined as "an individual or private business entity which employs the workforce at an establishment."[7]N.J.S.A. 34:21-1. On its face, the definition of "employer" does not include parent or affiliated corporations. Contrary to defendants' argument, however, that does not end our analysis, as the definition also does not exclude parent or affiliated corporations, provided they could be viewed as "employ[ing] the workforce at an establishment." N.J.S.A. 34:21-1.
Our objective in interpreting this statute is to determine the Legislature's intent. D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 119, 927 A.2d 113 (2007). We look first to the language of the statute itself, as that is generally the best indicator of legislative intent. Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195, 927 A.2d 543 (2007); Simon v. Cronecker, 189 N.J. 304, 327, 915 A.2d 489 (2007); DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005); Velazquez v. Jiminez, 172 N.J. 240, 256, 798 A.2d 51 (2002). However, where there is an ambiguity in the statutory language, we may look to extrinsic evidence to assist in our interpretation. Richardson, supra, 192 N.J. at 195-96, 927 A.2d 543; DiProspero, supra, 183 N.J. at 492-93, 874 A.2d 1039. We may "also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." DiProspero, supra, 183 N.J. at 493, 874 A.2d 1039.
The statute must be read consistently with common sense and the legislation's fundamental purpose. Velazquez, supra, 172 N.J. at 257, 798 A.2d 51; Cnty. of Monmouth v. Wissell, 68 N.J. 35, 42-43, 342 A.2d 199 (1975). See, e.g., Robinson v. Shell Oil Co., 519 U.S. 337, 341-46, 117 S.Ct. 843, 846-49, 136 L.Ed.2d 808, 813-17 (1997) (interpreting definition of "employees" *36 under Title VII to include former employees because that was consistent with fundamental purpose of the statute; allowing former employees to sue for post-discharge retaliation). Moreover, because the Act is a remedial statute, contrary to the motion judge's view, it must be construed broadly. See, e.g., Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115, 995 A.2d 1094 (2010); D'Annunzio, supra, 192 N.J. at 120, 927 A.2d 113; Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994).
The model for the Act was the federal WARN Act. See, e.g., Statement to [First Reprint] Assembly No. 1044 (Adopted May 22, 2006) ("All of the amendments are based on provisions of the federal `Worker Adjustment and Retraining Notification Act'"); Statement to [Second Reprint] Assembly No. 1044 (Adopted June 8, 2006) (noting that amendments to definitions of termination or transfer of operations make them consistent with the definition of "plant closing" in federal WARN Act). Indeed, the original version of the New Jersey WARN Act was conditionally vetoed by then-Governor Corzine, who recommended that it be revised to allow for notice of only sixty days to be consistent with the federal WARN Act and similar acts existing in other states. Conditional Veto Statement to Assembly Bill No. 1044 (Fourth Reprint) (2006-2007 Legislative Session).
Because the New Jersey Act was modeled after its federal counterpart, and the two statutes share the same purpose of protecting workers and communities by requiring employers to provide notice of plant closings and mass layoffs, compare Assembly Labor Committee Statement to A. 1044 (Feb. 27, 2006) with 20 C.F.R. § 639.1(a), in the absence of case law interpreting the Act, we look to federal WARN Act regulations and case law for guidance in interpreting the New Jersey WARN Act. Our Supreme Court has adopted this modality of examining related legislation in interpreting the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, which has several federal counterparts, as well as other legislative enactments. See, e.g., Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 261-67 (2010) (looking to Title VII precedents in interpreting LAD); Victor v. State, 203 N.J. 383, 4 A.3d 126 (2010) (looking to Americans with Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213, in interpreting LAD).
Defendants suggest that we eschew this analytical framework and read the Act restrictively, since the Act's definition of "employer" is comparatively less expansive than the definitions of employer set forth in the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-2(a),[8] the Wage Payment Law, N.J.S.A. 34:11-4.1(a),[9] and the LAD, N.J.S.A. 10:5-5(e).[10] *37 This is the approach adopted by the trial judge. However, the New Jersey WARN Act was not modeled after CEPA, the Wage Payment Law, or the LAD, nor does it share the same purposes as these statutes. Instead, it was modeled after and shares the same purpose as the federal WARN Act.
As previously stated, the New Jersey WARN Act defines the term "employer" as "an individual or private business entity which employs the workforce at an establishment." N.J.S.A. 34:21-1. The federal WARN Act defines the term "employer" as "any business enterprise" that employs 100 or more employees, excluding part-time employees, or 100 or more employees who in the aggregate work at least 4000 hours per week, exclusive of overtime hours. 29 U.S.C.A. § 2101(a)(1).
Neither the Act nor its federal counterpart contains language allowing for or excluding liability of parent and affiliated corporations. The issue has been addressed in the federal courts, however, which have concluded that parent and affiliated corporations may incur federal WARN Act liability. The Third Circuit has noted that, "[b]ecause a plant closure often presages a corporation's demise, leaving workers with no source of satisfaction from their employer, plaintiffs have frequently sought [federal WARN Act] damages from affiliated corporations." Pearson v. Component Tech. Corp., 247 F.3d 471, 476-77 (3d Cir.), cert. denied, 534 U.S. 950, 122 S.Ct. 345, 151 L.Ed.2d 261 (2001).
Federal regulation also supports this position. A regulation issued by the federal Department of Labor (DOL), interpreting the federal WARN Act's definition of employer, provides that:
Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.
[20 C.F.R. § 639.3(a)(2).]
This regulatory definition is known as the "five-factor test."
The DOL's "supplementary information" regarding its federal WARN Act regulations explains that:
The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN purposes; the definition is intended only to summarize existing law that has developed under State Corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA). The Department does not believe that there is any reason to attempt to create new law in this area especially for WARN purposes when relevant concepts of State and federal law adequately cover the issue. . . . Similarly, the regulation is not intended to foreclose any application of existing law *38 or to identify the source of legal authority for making determinations of whether related entities are separate. To the extent that existing law recognizes the joint employer doctrine . . . nothing in the regulation prevents application of that law.
[54 Fed.Reg. 16,045 (Apr. 20, 1989).]
Under the federal WARN Act, parent or affiliated corporations may incur liability. Even significant creditors of a corporation face potential liability. See, e.g., Coppola v. Bear Stearns & Co., 499 F.3d 144, 148-51 (2d Cir.2007) (noting that the test for lender liability under federal WARN Act is whether lender has become debtor's agent, partner, or alter ego; whether, at the time of plant closing, creditor was responsible for operating business as a going concern rather than acting only to protect its security interest and preserve business for liquidation or sale); Pearson, supra, 247 F.3d at 478, 491-95 (assessing creditor liability under federal WARN Act and applying the test set forth at 20 C.F.R. § 639.3(a)(2)); Adams v. Erwin Weller Co., 87 F.3d 269, 272 (8th Cir.1996) ("Only when a lender becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business will the degree of control necessary to support employer responsibility under federal WARN be achieved."); Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp., 66 F.3d 241, 244 (9th Cir.1995) (holding that a secured creditor may be an employer for federal WARN Act purposes "if at the time of the plant closing or mass layoff the defendant is responsible for operating the business as a going concern"); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. MRC Indus. Group, Inc., 541 F.Supp.2d 902, 905-10 (E.D.Mich.2008) (suggesting that defendants' actions exceeded conduct to protect an investment and were more akin to that of an employer).
The circuit courts of appeal that have addressed the issue of parent and affiliated-corporation liability have applied the "five-factor test," whereas some district courts, particularly in opinions issued prior to the circuit court opinions, have considered a multitude of tests. See, e.g., In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 242-45 (3d Cir.2008) (applying test set forth at 20 C.F.R. § 639.3(a)(2)), cert. denied, ___ U.S. ___, 129 S.Ct. 1670, 173 L.Ed.2d 1036 (2009); Childress v. Darby Lumber, Inc., 357 F.3d 1000, 1005-07 (9th Cir.2004) (same); Administaff Cos., Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div., Union of Needletrades, Indus. & Textile Emp. "UNITE," AFL-CIO, CLC, 337 F.3d 454, 457-58 (5th Cir.2003) (same); Pearson, supra, 247 F.3d at 478, 482-91 (same); Austen v. Catterton Partners V, LP, 709 F.Supp.2d 168, 173-78 (D.Conn. 2010) (same); Milan v. Centennial Commc'ns Corp., 500 F.Supp.2d 14, 26-28 (D.P.R.2007) (considering state corporate law, single employer theory under federal law, and federal WARN Act regulation in resolving single employer issue); Local 2-1971 of PACE Int'l Union v. Cooper, 364 F.Supp.2d 546, 564-65 (W.D.N.C.2005) (applying test set forth at 20 C.F.R. § 639.3(a)(2)); Vogt v. Greenmarine Holding, LLC, 318 F.Supp.2d 136, 140-44 (S.D.N.Y.2004) (same); Bledsoe v. Emery Worldwide Airlines, 258 F.Supp.2d 780, 786-87 (S.D.Ohio 2003) (same); UAW, Local 157 v. OEM/Erie Westland, LLC, 203 F.Supp.2d 825, 832-36 (E.D.Mich.2002) (same); United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp., 901 F.Supp. 426, 436-39 (D.Mass.1995) (considering state corporate law, single employer theory under federal law, and WARN Act regulation in resolving single employer issue).
*39 In Pearson, supra, 247 F.3d at 487-89, the Third Circuit rejected as "manifestly unworkable" the methodology of considering and applying a multitude of tests. Instead, it held that
the most prudent course is to employ the factors listed in the Department of Labor regulations themselves. This approach not only has the virtue of simplicity. . . but also allows for the creation of a uniform standard of liability for the enforcement of a federal statute. Finally, and most importantly, the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and, unlike traditional veil-piercing and some of the other theories, focus particularly on circumstances relevant to labor relations.
[Id. at 489-90 (citations omitted).]
The court stated,
the appropriate test to employ under the WARN Act for affiliated corporate liability is the multi-factored test promulgated by the DOL [at 20 C.F.R. § 639.3(a)(2)]. We believe that the DOL's instruction that courts apply "existing law" to questions involving intercorporate liability was not intended to undermine the force of its own regulation on the subject, but was instead intended to instruct courts that existing precedent applying other tests (such as the "integrated enterprise" test) may be useful and appropriate to resolve analogous questions arising under the WARN Act. We also observe that the regulation indicates that the listed factors are not an exhaustive list, which we interpret as a reminder that the test is one of balancing, and that, as with any balancing test, a number of circumstances not specifically enumerated may be relevant.
. . . .
We ultimately hold that because the lines separating "parents" from "lenders" are not often bright ones, the simpler approach is to apply the same test for liability regardless of the formal label the corporations have attached to their association. . . . Therefore, we take a more functional approach to determining whether or not to "pierce the veil" under WARN by focusing on the nature and degree of control possessed by one corporation over another; in so doing, however, particular weight must be accorded, where applicable, to a lack of ownership interest between corporations.
[Id. at 478.]
See also id. at 490-96.
The five-factor test set forth at 20 C.F.R. § 639.3(a)(2) is a fact-specific balancing test. No one factor is controlling, "and all factors need not be present for liability to attach." Vogt, supra, 318 F.Supp.2d at 142.
[T]he question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. [Pearson, supra, 247 F.3d at 495-96.] Accordingly, the goal of the five-factor test . . . is to determine whether [the parent or affiliated company] had become "so entangled with [the other company's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities. Id. at 491.
[In re APA Transport Corp., supra, 541 F.3d at 244.]
*40 We conclude that in determining single-employer status under the New Jersey WARN Act, our courts should apply the five-factor test set forth at 20 C.F.R. § 639.3(a)(2), with consideration of additional factors permissible where relevant. This test was developed specifically for federal WARN Act cases, and provides an appropriate methodology for resolving the issue of employer status. Even though adopted as an outgrowth of the federal WARN Act, we have observed that both the federal and New Jersey WARN Acts share the same purpose. Moreover, as the New Jersey Warn Act's definition of "employer" is more expansive than the federal Act's definition, compare N.J.S.A. 34:21-1 with 29 U.S.C.A. § 2101(a)(1), the Act should not be interpreted more restrictively than its federal counterpart. This is the critical error in the trial judge's reasoning.
Although application of the test is a factual question, not a legal one, Pearson, supra, 247 F.3d at 496, the inquiry must focus on whether plaintiffs have submitted sufficient evidence to create a genuine issue of material fact and survive summary judgment. Id. at 497.

C.
We now address the elements of the five-factor test. Factor one addresses whether there is common ownership while factor two addresses whether there are common directors or officers. These factors are considered less significant than the other three factors. In re APA Transport Corp., supra, 541 F.3d at 243-44; Childress, supra, 357 F.3d at 1005-06. A positive finding on these factors is not dispositive in establishing that two entities constitute a single employer. In re APA Transport Corp., supra, 541 F.3d at 243-44.
The record is limited on both factors. It does not reflect that LSFV has any direct ownership of Accredited; however, LSFV has a substantial ownership interest in the LSFV affiliated companies that own Accredited.
In considering directors or officers, we note that the parties have not provided a list of the directors and officers of any of the three companies. However, the record reflects some overlap in senior management, with Moran apparently holding senior executive positions at Accredited, Lone Star, and Hudson, and Grayken being the sole beneficial owner of Hudson and a substantial participant in all of the LSFV companies.
Factor three considers whether the parent or affiliated company exercised de facto control over the direct employer. "The core [consideration] of this factor is whether one company `was the decisionmaker responsible for the employment practice giving rise to the litigation.'" In re APA Transport Corp., supra, 541 F.3d at 245 (quoting Pearson, supra, 247 F.3d at 503-04).
Further, because the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly strikingfor instance, were it effectuated by "disregarding the separate legal personality of its subsidiary," Esmark, Inc. v. NLRB, 887 F.2d 739, 757 (7th Cir.1989)then liability might be warranted even in the absence of the other factors.
[Pearson, supra, 247 F.3d at 504.]
See also Austen, supra, 709 F.Supp.2d at 177 ("De facto control is perhaps the most important prong of the DOL test. . . .").
As to this factor, the record reflects that after LSFV Accredited purchased Accredited Holding, Hudson, LSFV and Accredited Holding entered into an asset advisory agreement pursuant to which Hudson provided oversight and support services to *41 Accredited. According to Mohan, during this time period, Accredited's senior management lost day-to-day control of the business. Prushan, who was employed by Hudson, was involved in evaluating Accredited's business, and in planning and implementing the shutdown of the office.
Giving plaintiff all favorable inferences, the record reflects that LSFV, through Hudson, exercised control over Accredited and ordered the closure of the office. The trial court also recognized that this presented a factual dispute that was unresolvable on summary judgment.
Factor four considers whether there exists a unity of personnel policies emanating from a common source. This factor concerns whether the companies functioned as a single entity with respect to their relationship with their employees. Examples include centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping. In re APA Transport Corp., supra, 541 F.3d at 245; Pearson, supra, 247 F.3d at 499. It does not focus on whether the parent or affiliated company made the employment decision that gave rise to the WARN Act litigation. That issue is addressed under factor three. Pearson, supra, 247 F.3d at 500. But see Vogt, supra, 318 F.Supp.2d at 142-43.
The record on this issue is also limited. There is no information presented as to the personnel policies of LSFV or Hudson, and very little information as to the personnel policies of Accredited. However, under the asset advisory agreement, Accredited retained authority over hiring and firing personnel, and plaintiffs admitted that their employment was governed by Accredited's personnel policies. They never received any policies issued by LSFV, or any employee benefits provided by LSFV.
Finally, factor five considers the dependency of operations between the relevant companies. Application of this factor requires analysis of the general administrative structure of the related entities, such as, whether there are shared administrative or purchasing services, interchanges of employees or equipment, or commingled finances. In re APA Transport Corp., supra, 541 F.3d at 244 n. 9, 245; Pearson, supra, 247 F.3d at 500. Control over day-to-day operations is also indicative of interrelation of operations. Pearson, supra, 247 F.3d at 501.
The record is barren of information concerning the related companies' administrative or purchasing services, their finances, or their interchanges of employees or equipment. However, the asset advisory agreement reflects that Hudson was to provide substantial administrative services for Accredited, and according to Mohan, after LSFV Accredited purchased Accredited, Accredited's management lost day-to-day control of the company.
Applying the five-factor test, we conclude that plaintiffs have presented sufficient evidence to withstand summary judgment, particularly since their proofs as to factor three are relatively strong. However, since the record was not developed with the five-factor test in mind, we conclude that the appropriate remedy is reversal and remand to further develop the record. On remand, the trial court shall apply the five-factor test, with consideration of additional factors permissible, where relevant, to determine whether either LSFV or Hudson, or both, could be considered plaintiffs' employer. At the remand hearing, the parties may also resolve their disputes as to whether the Act applied to the office closure, including their disputes as to the number of employees in the office and the number of employees *42 discharged as a result of the office closure.[11]

D.
While we adopt the five-factor test to determine whether parent and affiliated companies may be held liable under the New Jersey WARN Act, we recognize that other tests may be advanced to supplement the primacy of the five-factor test. We acknowledge that many of the principles of the supplementary tests overlap those presented in the five-factor test, yet they are helpful in resolving the issue of identification of the employer under the Act. We caution that the other tests, which we now discuss, are supplementary to the basic analysis under the five-factor test.
The most obvious supplementary test is the common law standard for piercing the corporate veil. As advanced by the Court:
Except in cases of fraud, injustice, or the like, courts will not pierce a corporate veil. The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law.
Under certain circumstances, courts may pierce the corporate veil by finding that a subsidiary was "a mere instrumentality of the parent corporation." Application of this principle depends on a finding that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent. Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.
[State, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500-01, 468 A.2d 150 (1983) (citations omitted).]
See also Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J.Super. 160, 198-200, 903 A.2d 475 (App.Div.2006), certif. denied, 189 N.J. 429, 915 A.2d 1052 (2007); OTR Assocs. v. IBC Servs., Inc., 353 N.J.Super. 48, 51-52, 801 A.2d 407 (App. Div.), certif. denied, 175 N.J. 78, 812 A.2d 1110 (2002).
There also is a test for determining whether a joint employment relationship exists for various employment-law purposes. See, e.g., Commc'ns Workers of Am. v. Atl. Cnty. Ass'n for Retarded Citizens, 250 N.J.Super. 403, 416, 594 A.2d 1348 (Ch.Div.1991) ("when two or more employers exert significant control over the same employees, that is, where they share in the determination of matters governing essential terms and conditions of employment, they are considered `joint employers' within the meaning of the NLRB"). Accord NLRB v. Browning-Ferris Indus., Inc., 691 F.2d 1117, 1123 (3d Cir.1982) ("`joint employer' concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment").
Additionally, there is the four-factor test for establishing a "single employer," "integrated employer" or "integrated enterprise" for various employment-law purposes, under which courts consider whether the various companies share common ownership or financial control, common management, an interrelation of operations, and centralized control *43 of labor and employment decisions. Applying this test, no single factor is dispositive, but the factor examining control of labor relations, and particularly control over the employment decision at issue, are deemed the most significant factor. See, e.g., Nesbit v. Gears Unltd., Inc., 347 F.3d 72, 84-85 (3d Cir.2003), cert. denied, 541 U.S. 959, 124 S.Ct. 1714, 158 L.Ed.2d 400 (2004); Pearson, supra, 247 F.3d at 485-86; Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir.1999), cert. denied, 529 U.S. 1116, 120 S.Ct. 1978, 146 L.Ed.2d 806 (2000); Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 777 (5th Cir.1997); Esmark, supra, 887 F.2d at 753.
As we have noted, the principles informing these various tests may prove helpful in determining the ultimate issue in dispute.

III.
Finally, we reject defendants' argument that the claims against them are not ripe because, even if they could be held liable as plaintiffs' employer, their liability would be secondary and premised upon Accredited's failure to comply with its obligations under the Act. See Mulford v. Computer Leasing, Inc., 334 N.J.Super. 385, 399, 759 A.2d 887 (Law Div.1999) (observing that under the Wage Payment Law, liability of directors and officers was secondary to corporation's liability "so that their personal liability only comes into play to the extent [the corporation] does not pay its judgment"). They note that plaintiffs have reached a partial settlement with Accredited, and that their liability would only occur should Accredited fail to make plaintiffs whole.
This argument is without merit. If LSFV or Hudson, or both, are held liable under the New Jersey WARN Act as plaintiffs' employer, their liability would be direct and primary, not secondary. Liability would be imposed based upon their own actionshutting down the officeand inactionnot providing notice or severance payand not those of Accredited.

IV.
We conclude that the New Jersey WARN Act must be read consistently with the federal WARN Act, and in determining the issue of whether a parent of affiliated company is the employer under the New Jersey WARN Act, the trial court must apply the DOL's five-factor test that we have identified. Accordingly, we reverse and remand for further proceedings in the Law Division consistent with this opinion.
Reversed and remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] This issue is irrelevant to the issue before us since it relates to the question of whether the New Jersey WARN Act was violated, and not whether the parent company or affiliates may be liable under the Act. Despite defendant's argument that the Act did not apply to the office closure because Accredited employed an insufficient number of full-time employees in the office, and it discharged an insufficient number of full-time employees as a result of the office closure, this issue could not be resolved on summary judgment, as there were material issues of fact in dispute. For the purposes of this appeal, we accept plaintiffs' contention that at least sixty full-time employees were discharged as a result of the June 4, 2008, office closure, which would bring the closure within the ambit of the Act. N.J.S.A. 34:21-2. By contrast, defendants assert that there were only forty-six employees, and only thirty-five were discharged. Since this argument cannot be resolved in the present appeal, we do not address it further.
[2] The affidavit of Marc Lipshy, the vice president of LSFV, states that LSFV owns a 62.7% share of LSFV Holdco, whereas the chart attached to the affidavit states that LSFV owns a 63.7113% interest.
[3] "`Termination of operations' means the permanent or temporary shutdown of a single establishment, or of one or more facilities or operating units within a single establishment. . . ." N.J.S.A. 34:21-1. A "facility means a building." N.J.S.A. 34:21-1. An "`operating unit'" is "an organizationally distinct product, operation, or specific work function within or across facilities at a single establishment." N.J.S.A. 34:21-1.
[4] "`Termination of employment' means the layoff of an employee without a commitment to reinstate the employee to his previous employment within six months of the layoff. . . ." N.J.S.A. 34:21-1.
[5] "`Full-time employee' means an employee who is not a part-time employee." N.J.S.A. 34:21-1. "`Part-time employee'" is defined as "an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than six of the 12 months preceding the date on which notice is required pursuant to this act." N.J.S.A. 34:21-1.
[6] "Mass layoff" is defined as

a reduction in force which is not the result of a transfer or termination of operations and which results in the termination of employment at an establishment during any 30-day period for 500 or more full-time employees or for 50 or more of the full-time employees representing one third or more of the full-time employees at the establishment.
[N.J.S.A. 34:21-1.]
[7] The term "establishment" is defined as "a single place of employment which has been operated by an employer for a period longer than three years. . . . `Establishment' may be a single location or a group of contiguous locations. . . ." N.J.S.A. 34:21-1.
[8] Under CEPA, an "employer" is defined as "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof." N.J.S.A. 34:19-2(a).
[9] Under the Wage Payment Law, an "employer" is defined as "any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of a deceased individual, or the receiver, trustee, or successor of any of the same, employing any person in this State," and "[f]or the purposes of [the] act the officers of a corporation and any agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation." N.J.S.A. 34:11-4.1(a).
[10] Under the LAD, an "employer" is defined as including all persons as defined at N.J.S.A. 10:5-5(a) ("one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries"), unless otherwise specifically exempt, "and includes the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies." N.J.S.A. 10:5-5(e).
[11] We recognize that these issues may require discovery and testimony and the trial judge should not preclude the parties from such, if required.